**FARISH CO. v. MADISON DISTRIBUTING CO., Inc.**

Circuit Court of Appeals, Second Circuit.
January 13, 1930

No. 145.

Herman C. Pollack, of New York City, for appellant.

H. M.. Stephens, of Los Angeles, Cal., and Haight, Smith, Griffen & Deming, of New York City (E. R. Kraetzer and Gray Williams, both of New York City, on the brief), for appellee.

Before L. HAND, SWAN, and MACK, Circuit Judges.

L. HAND, Circuit Judge. The plaintiff was a cotton commission house acting on behalf of a North Carolina mill, originally known as the Shelby Cloth Mills, later as the Cleveland Cloth Mills. The defendant used such fabrics in its business. The facts, as the jury might have found them, were as follows:

On November 25, 1925, one E. R. Valentine, a salesman of the plaintiff, made a written contract with the defendant for the delivery of such goods, and on December 15, 1925, an oral contract for another delivery, for which Valentine wrote out an unsigned order. Both these recited that the contract was made "for the account of Shelby Cloth Mills to Madison Distributing Company." When these contracts came to the notice of one Gerdes, the plaintiff's credit man, he declined to accept them and spoke on the telephone to Oppenheimer, the defendant's manager, who told him that the defendant's factor, Pelz, Greenstein & Co., would guarantee payment. Gerdes accepted the assurance without communicating with the factor, and in his own hand changed the contract and order, so that they read "to Pelz, Greenstein & Co. Dept. Madison Distributing Co." He also changed the address to that of the factor. "Dept." was a way not uncommon in the trade of designating the relation of principal and factor.

These two contracts were not involved in the case at bar, but four later ones were, dated January 18, February 5, March 5, and March 15, 1926. Each of these was oral, and for each Valentine prepared a written order (two for the first), which read like the earlier after Gerdes had changed them. The plaintiff carried the account on its books in the factor's name, and sent all invoices to it, until the parties began to fall out about the middle of May, after which it directed them to the defendant. The defendant accepted a large part of the goods, and in some instances, at any rate, paid for what it received, though the factor paid for the greater part.

About the middle of May the defendant was in arrears in a number of payments, and had not got the guarantee of Pelz, Greenstein & Co. Three of the plaintiff's employees had an interview with Oppenheimer, who denied that he had promised to procure the guaranty and demanded more time for payment of the overdue bills. On condition that the factor should guarantee these, the plaintiff gave an extension of 60 days, and eventually the defendant procured a guarantee of six invoices, all the factor ever did guarantee. At about this time, May 13, 21, and 29, the plaintiff sent invoices to the defendant for the remainder of the goods covered by the four contracts in suit, which the mill sent to the defendant's dyers in Passaic, making out the bills of lading to the plaintiff. So far as we can infer from the very scanty evidence on the issue, delivery was commonly made by notifying the dyers that the goods were at the defendant's disposal; but as to none of the installments here involved were the dyers ever notified, the defendant not being ready at any time to accept. Because of what happened in the summer of 1926, we do not find it necessary to decide this question, and shall assume with the defendant that no delivery was ever made.

Towards the end of July the plaintiff, becoming tired of the delays, asked Oppenheimer to accept the balance then in the dyers' possession, or, if not, that it be allowed to resell them at a loss. The defendant refused, saying that it hoped to "move" them shortly, as soon as it could get more money from its factor. The matter was then allowed to drag along for two weeks more, when substantially the same talk was repeated. Finally, about the middle of September,

the plaintiff insisted upon a third interview, when the defendant offered to accept the undelivered balance, if the plaintiff would sell it at a reduced price, which the plaintiff refused: It resold the bulk of what it held for the defendant's account on October 7, and the remainder on February 9 and March 15, 1927.

Before disposing of these goods, which were of a special pattern, the plaintiff "covered the trade" as best it could, did "a lot of missionary work," "canvassed" the market, and realized "on that market a fair price." Just what was meant by the last phrase does not appear, but apparently there was no ready sale, nor any active competition between buyers who were in need of such goods. The judge in his colloquial charge left it to the jury to find the difference between the contract and the market price, but later, upon request of defendant for an added instruction, delivered himself as follows: "If the market price when the contract was broken, gentlemen, was at one figure, and before the goods could actually be moved * * * it declined further, of course that loss would come on the defendant." The jury found for the full damages claimed, plus an amount equal to interest from the collection upon the resale of October 7th to the day when the trial opened. Nothing was said about interest in the charge, but the complaint demanded it.

The first question is one of pleading. The defendant asserts that the plaintiff was not the seller, but the Cleveland Cloth Mills. It conceded, however, that before the writ issued the plaintiff had acquired the interest of the mill in the goods. While the complaint alleged the contract to have been made with the plaintiff, the answer alleged that the mill was the seller, and a reply that the plaintiff had been bound to pay the mill for the goods and had done so. No doubt the answer should have been confined to a traverse, but the defendant chose to plead evidence as a defense, and the reply alleged further evidence, which in fact showed that the plaintiff was the real party in interest, for it was irrelevant whether it was such as seller or as assignee. Thus the pleadings, taken as a whole, disclosed facts upon which the plaintiff's claim might rest. We no longer cut fine in such matters, when there is no substantial interest at stake. The New York Civil Practice Act (sections 105, 283) has left such questions to the discretion of the court, and the pleadings may be amended at any stage. The point is devoid of merit, and would in our judgment have been so, even

without the reply. Webb v. Central R. R. (C. C. A. 2, Dec. 9, 1929), 36 F.(2d) 702.

The question whether the defendant was the buyer was one of evidence, for the contracts were not written. If the jury believed the plaintiff's witnesses, there could be no doubt. The factor had been introduced into the transaction only as a guarantor; its business was confined to advancing money, and it bought no goods. It is impossible that either party should have supposed the contrary. The defendant received and used the larger part of the goods, paid some of the freight bills, and even part of the purchase price. Oppenheimer repeatedly recognized that acceptance lay with him, asked for extensions, bargained for a reduction in price, and provoked the final rupture. There was no conceivable color for pretending that the factor was the buyer, except the action of the plaintiff in so carrying the account and in billing the goods. That was theoretically relevant upon the issue, but it was of trivial weight to show that the plaintiff meant to sell to the factor. No honest jury could have come to any other verdict than that rendered.

The question of damages depends upon the time of the breach and the rule of computation. The defendant does not assert that there was a delivery, and, as we have already said, there apparently never was; certainly none definitely appears. There was, however, enough evidence of repudiation on September 14th to support a verdict. Oppenheimer had repeatedly put off the plaintiff through the summer of 1926, refusing to declare himself. No doubt this authorized the seller to declare a breach, though it did not require him to do so; the time of performance might be put over, if both sides agreed. At the last interview Oppenheimer's position changed; he no longer repeated that he meant to perform, but submitted an offer to accept at a new price. This justified the seller in crying off; the jury might find that the buyer intended, not as a tentative proposal, but as a definitive position, his refusal to accept as stipulated.

As title had not passed, section 141, subdivision 1, of the New York Sales Act (Consol. Laws, c. 41, art. 5), did not apply, and damages were to be computed under subdivision 2 or subdivision 3 of section 145, depending upon whether there was an "available market" for the goods, unless we may regard the resale prices as evidence of market value on September 14th. Duncan v. Wohl, South & Co., 201 App. Div. 737, 195 N. Y. S. 381. It probably makes no differ-

ence whether we say that there was no such market or that there was. If the first, the case fell within subdivision 2 of section 145, and the seller could fix the damages "directly and naturally resulting from" the breach by a resale of the goods, if made with diligence. Smith v. Pettee, 70 N. Y. 13; Moore v. Potter, 155 N. Y. 481, 50 N. E. 271, 63 Am. St. Rep. 692; Ackerman v. Rubens, 167 N. Y. 405, 60 N. E. 750, 53 L. R. A. 867, 82 Am. St. Rep. 728; Jardine, etc., Co. v. Huguet Silk Co., 203 N. Y. 273, 96 N. E. 449. If the second, the market was of such a kind that the price could not be immediately ascertained, and the resales were the only evidence.

We prefer, however, to rest our decision on the first ground, because it is extremely artificial to speak of an "available market" under such conditions as existed at the time. It is apparent that the goods, being, as we have said, of a special pattern, could not be sold without hawking them about among persons ready to pick up such commodities. This took time; indeed, not all could be sold for six months, though the jury found that the plaintiff had been diligent. It was certainly permissible to infer that buyers were not at hand, ready to accept, and by their competition to establish what is colloquially known as a market.

The question is, no doubt, one of degree, but it appears to us that the instance before us might be held to be safely beyond any equivocal zone. In New York, before the statute, perhaps the seller had the remedy of resale even when there was a market; some of the cases we have cited seem to imply as much; but the point has ceased to have any importance. All we need hold, as we do, is that where there is none, the remedy remains, and is sanctioned by subdivision 2 of section 145.

■ Neither the judge nor the parties seem to have understood the distinction, for both talked of market value. In his colloquial charge the judge spoke only of this, but during the defendant's requests and exceptions he modified his instructions as we have quoted. The result did, indeed, leave something to be desired; but still we think that the jury was advised of all the facts necessary for their decision. The substance of what he said was that, if the goods could not be sold with reasonable effort, the loss in any supposititious market value must fall upon the defendant. As we view it, this must have been understood as meaning that, if there was no available market, as we un-

derstand it, an honest resale might be the measure. At any rate a mere exception to that charge did not serve to point out its defects, if it had any. There were, in fact, but two questions: Whether the goods could be readily sold, and whether the seller had proceeded diligently. Both were presented.

■ Again, as to the award of interest: The complaint demanded, and the evidence warranted, it. Though the judge did not mention it, the verdict is not bad because the jury correctly divined their powers. It is true that the record is not clear upon the return of the verdict, but the facts make it inconceivable that the foreman's answer should have meant anything, except that the jury, like the judge, was at an end with the defendant's obstructions and objections.

Much of the evidence was documentary, recording events which were at times not within the personal knowledge of the declarant. At common law, in some instances, the documents would probably not have been competent, without supporting proof; perhaps they would not have been, even with the latitude of our own later decisions. Since the case was at common law, however, the local statute applied, and the amendment to the New York Civil Practice Act (section 374-a as added by Laws 1928, c. 532) covered any instances in which the documents were made in the regular course of business. If there were any in which this was not true, the defendant does not advise us. None would matter, unless their exclusion would have left the case defective upon some critical matter, necessary to the cause of action. The facts were too plain, and the result too just, to make incidental errors of consequence.

■ There remains the question of the general conduct of the trial. Shortly after the case began, the defendant's attorney saw a juror talking in the corridors with a member of the panel who had been excused on voir dire. He overheard some of the talk, which appeared to concern the case, and called the judge's attention to it, who thereupon examined both men concerned and the attorney. The inquiry was, indeed, not conducted with entire deftness; but we can see nothing in the result that was beyond the judge's discretionary powers. When a party undertakes to bring such a matter forward, it must either be ignored or examined. An examination of the juror involved is indeed likely to arouse his feelings, and it is a choice involving some risk to the party who moves it, if the inquiry does not show the challenge

to be well based. Here it did not; we cannot say that any possible prejudice was more than what was inevitable.

Besides this, the defendant complains of the judge's bearing throughout the trial. Unhappily asperity did develop between the two, which the record shows to have increased as the trial went on. On the whole, it appears to us that the judge showed forbearance under provocation. There was an almost constant fusillade of objections and exceptions, which have greatly extended the record, and which delayed the trial. Many, such as that the questions involved conclusions, were clearly irrelevant, for that is a matter resting altogether in the judge's discretion, save in the rarest instances. The learned attorney showed an inadequate conception of a judge's proper function, of his power to stop cross-examination, to control and direct the jury, and to prevent the trial from degenerating into a barren battle of words. On the judge rests the chief responsibility for the result; he is the cornerstone of any effective administration of trial by jury, and we are disposed to give him great leeway. In the case at bar we should have supported a larger exercise of his authority to repress conduct which at times exceeded permissible limits. If the defendant's case was in the end prejudiced before the jury, its sins must rest upon its own head.

Judgment affirmed.