**UNITED STATES v. CITY OF NEW YORK.**

**No. 88.**

Circuit Court of Appeals, Second Circuit.

Dec. 9, 1942.

William C. Chanler, of New York City, Corporation Counsel (Paxton Blair and Philip L. Wellens, both of New York City, of counsel), for appellant.

Mathias F. Correa, U. S. Atty., Samuel Brodsky and Frank J. Dufficy, Asst. U. S. Attys., all of New York City, Francis M. Shea, Asst. Atty. Gen., Sidney J. Kaplan,

Sp. Asst. to the Atty. Gen., and William S. Ward, Atty., Department of Justice, of Washington, D. C., for plaintiff-appellee.

Before L. HAND, CHASE and FRANK, Circuit Judges.

CHASE, Circuit Judge.

The controversy, which led to an action by the United States against the City of New York in the District Court for the Southern District of New York to enforce specific performance of a contract for the sale of land by the plaintiff to the defendant and to a decree for the plaintiff from which the defendant has appealed, grew out of the following facts and circumstances.

In 1867 the city conveyed to the United States certain land in City Hall Park in New York City for use as the site of a building to be erected for use as a post office and court house. The conveyance was upon the condition that the land and any building erected thereon should be used only for the above named purposes and if such condition was broken the land would revert to the city. The United States erected a building on the land which it used exclusively for the named purposes for many years. By 1919 the reasonable needs of the government could not adequately be met by the continued use of the building so erected and the erection of a new and adequate building on the same site was taken under consideration.

This site, which will hereinafter be called the old post office site, was wanted by the city for inclusion in, and use as a part of, City Hall Park. To accomplish that end, the Board of Estimate and Apportionment of the city authorized the beginning of negotiations with the government for its acquisition and these were undertaken with the aid and support of civic organizations. The government was willing to relinquish the old post office site provided it could acquire adequate and suitable land elsewhere and after some time the idea took form that the new land should include two separate sites on one of which the government should erect a new court house and on the other a new post office.

It was apparently easier to find a suitable site for the contemplated new court house and in 1928 a site for it in the civic center, now called Foley Square, on land owned by the city had been found to be suitable and the Secretary of the Treasury wrote to the then Mayor of New York inquiring whether the city would sell it to the government and leave for further consideration the occupancy of the old post office site for a post office. The Mayor replied that the Board of Estimate and Apportionment had unanimously decided that the civic center site for a court house would be given to the government in consideration for the removal of the building on the old post office site. The Secretary replied that the government would exchange the old post office site for an adequate new one but that the latter had not been found and asked for the price at which the proposed court house site could be purchased. The Board of Estimate and Apportionment on October 4, 1928, passed a resolution expressing its opinion that it was unfair for the government to expect the city to provide two sites and requesting that the government purchase a new post office site and vacate the old one. The Secretary replied on October 13, 1928, that the difficult problem was to provide for the postal service in New York City and that the ideal location of the present post office made it of "vital importance" that any other site offered in exchange by the city should be in close proximity to the old. He further stated that "the * * * possibility of greater latitude for the selection of a site for a building for the federal courts" and the need for prompt action to provide such a building made it essential to treat that "as a separate problem."

On the 31st of the same month the Mayor again wrote the Secretary to the effect that the Board was willing to provide free of cost the civic center site valued at $2,250,000 for a court house and in addition property on Church Street, between Vesey and Fulton Streets, which the city owned and valued at $340,000 which could be used with adjacent property the government might acquire for a post office. The Secretary replied to this proposal on November 21, 1928, by stating some of the difficulties to be overcome in fulfilling the desire of the city to have the old post office site made available for addition to its municipal grounds but expressed a disposition to help in that regard and said that, "If the City finds it possible to offer a site suitable for post office purposes but does not care to donate at the same time a site for a Court House as indicated in our previous correspondence, this Department would be prepared to take up the question of purchasing the Court House site."

In this way it came about that the arrangements for adding the old post office site to the city's park eventually took the form of a purchase by the government from the city of a site in Foley Square on which a court house was erected and the acquisition by the government of land on Vesey Street, partly by purchase and partly by condemnation, on which a new post office was built. The government has paid the city $2,450,000 for the site for the court house and there is no dispute as to that phase of the matter. It has moved its post office into a new building on Vesey Street and vacated the building on the old post office site. That building has been torn down by the city and the site added to its park under a stipulation providing that if the government does not prevail in this suit it may within one year take over the old site and erect a building thereon for the use to which it was at liberty to put the building torn down without regard to any failure meanwhile to continue such use.

This suit and stipulation followed the request of the city for permission to begin tearing down the old building before the government moved the post office to the new building and the insistence of the government that the city pay to it what it claims was the purchase price of the old post office site under a contract providing for its conveyance to the city. The city refused to recognize any obligation to pay anything for the right to add the land to its park. This refusal was based upon the contentions (1) that no contract so to do which was definite enough to be valid was made; (2) that any contract made did not satisfy the requirements of the Statute of Frauds; and (3) that it was never either authorized or ratified so as to become binding upon the city.

These issues can be resolved only by reference to the pertinent correspondence between the then Mayor and Secretary which followed the tentative plan, already set forth, for accomplishing the results both parties desired and to the subsequent steps taken in behalf of the city for it is undisputed that no formal written contract was ever executed and that the Board of Estimate and Apportionment never authorized one in the manner provided by the city's charter.

After 1928 the matter continued to be considered by representatives of the city and of the government until on April 30, 1930, the Commissioner of Public Works of the city recommended to the Mayor that the city pay the government $3,750,000 for the old post office site and the government pay the city $2,700,000 for the Foley Square site. This proposal was made known to the Under Secretary of the Treasury and on May 12, 1930, the Secretary wrote the Mayor suggesting, in accordance with a formula proposed by the Merchants' Association, that the price of the Foley Square site be set at $2,450,000 and that the city agree to pay the government for the old post office site that proportion of the cost of the Vesey Street site which the area of the old site bore to that of the new one.

This is the background against which the following three letters must be read which the government contends show the consummation of the contract it relies on. On June 6, 1930, the Mayor wrote the Secretary as follows:

"Your letter of May 12, 1930, referring to the proposed disposition of the Federal Building in City Hall Park, received careful consideration by the members of the Board of Estimate and Apportionment in executive session, at their meeting today.

"It affords me great pleasure to be able to inform you that your suggestion that the valuation of approximately $2,450,000 for the city property in the Civic Center, as appraised by the Special Appraisals Committee of the Real Estate Board of New York, was acceptable to the members of the Board of Estimate and Apportionment.

"Therefore, I am now authorized to offer that The City of New York will pay the Federal Government the sum of $3,750,000 to receive the old Federal Building site free of all incumbrances, and will at the same time sell to the Federal Government the proposed site for a Federal Court building in the Civic Centre for the sum of $2,450,000.

"In your communication you state that your department will give favorable consideration to the condemnation by the Federal Government of the Barclay, Vesey and West Broadway site under an agreement with The City of New York that the City shall bear that proportion of the cost of such site as will bear the same relation to the total cost as the area of the Federal property bears to the total area of its Vesey Street block, as the basis for an exchange of the Federal property in City Hall Park.

"This alternative is also agreeable to the members of the Board of Estimate and Apportionment, although it presents some technical difficulties which the other proposal avoids.

"The Board has asked me to inform you that it is considered important that a time be fixed in the agreement for the removal of the present Federal Building.

"The City officials stand ready to expedite the transfers in every way possible and upon advice from you the financial and legal details will be formally prepared and submitted."

To this letter the Secretary on June 12, 1930 replied:

"I have your letter dated June 6, 1930, advising acceptance by The City of New York of the Department's suggestions regarding the sale to the Government of a site in the civic center for the United States courts and the basis for the disposition of the Federal property at Park Row and Broadway.

"The said basis is to be as follows: That the City of New York, in exchange for the Federal property in City Hall Park, shall agree to bear that proportion of the cost of acquiring the Vesey Street block as will bear the same relation to its total cost as the area of the Federal property bears to the total area of the Vesey street block.

"The Department is prepared to recommend to Congress the amendment of existing legislation whereby the Secretary of the Treasury will be authorized to proceed with the acquisition by purchase, condemnation or otherwise of the block bounded by Barclay, Vesey, and Church Streets and West Broadway for a site for the accommodation of the post office and other Government offices, and for further authority to enable him to accept your offer, for the sale to the United States of a site in the civic centre of New York for a Federal court building for the sum of $2,450,000.

"It is considered that the simplest method of handling the proposition, so far as the so-called Vesey street block is concerned, would be for the Government to proceed with the acquisition thereof in such manner as it finds to be to the best interests of the Government and to convey to The City of New York, upon payment to the United States of its proportion of the cost of the Vesey street site, the Federal building and the site thereof at Park Row and Broadway.

"In order that there may be no misunderstanding regarding the area of the Federal property at Park Row and Broadway, you are advised that such area as shown by the title papers on file in this Department is 65,259 square feet.

"It is suggested that you have a representative of the City visit this Department to take up the details of the matter on the basis above outlined."

And on December 6, 1930 made further reply as follows:

"Further reference is made to your letter of June 6, 1930, and the Department's response of June 12, 1930, in which was confirmed the basis for the exchange of the Federal property at Park Row and Broadway, New York City, as follows:

"That The City of New York, in exchange for the Federal property in City Hall Park shall agree to bear that proportion of the cost of acquiring the Vesey street block as will bear the same relation to its total cost as the area of the Federal property bears to the total area of the Vesey street block.

"The Department is prepared to recommend to Congress the amendment of existing legislation whereby the Secretary of the Treasury will be authorized to proceed with the acquisition by purchase, condemnation or otherwise of the block bounded by Barclay, Vesey and Church Streets and West Broadway, for a site for the accommodation of the Post Office and other Government offices, and for further authority to enable him to accept your offer for the sale to the United States of a site in the civic centre of New York for a Federal Court building for the sum of $2,450,000.

"It is considered that the simplest method of handling the proposition, so far as the so-called Vesey Street block is concerned, would be for the Government to proceed with the acquisition thereof in such manner as it finds to be to the best interests of the Government, and to convey to The City of New York, upon payment to the United States of its proportion of the cost of the Vesey Street site, the Federal Building and the site thereof at Park Row and Broadway.

"Based on this understanding the Department has endeavored to secure satisfactory proposals from the various owners for voluntary conveyance, but so far without success. Further effort in this direction is being made, but it is evident that some

of the parcels at least may have to be acquired by condemnation. Unless satisfactory prices can be secured shortly, steps will be taken to institute condemnation proceedings, so that the amounts for which the Federal Government and the City, respectively, will be obligated under the above agreement may be determined.

"In further pursuance of the understanding in this matter, and looking forward to the final consummation of the details of the arrangement, the Department would now like to have a formal proposal for the sale to the United States of the site in the civic centre for $2,450,000, and it will be appreciated if such proposal can be forwarded at an early date. There are inclosed for your use forms of proposals in use by the Department, together with the accompanying condition sheets relative to the sale of building sites to the Government."

On June 24, 1930, the Mayor issued a public statement to the effect that the city and the government had reached an agreement for the carrying out of which the authorization of Congress would be sought and by the Act of July 3, 1930, c. 846, 46 Stat. 860, 901, the Secretary was given the power necessary.

On January 21, 1931, the formal proposal for the sale of the civic center site was sent to the Secretary as requested. Meanwhile the corporation counsel of the city had undertaken to secure special legislation from the New York legislature in authorization of the steps proposed to be taken and had caused a bill to be introduced which was duly passed and with the approval of the Governor on February 27, 1931, became effective on that date (Chap. 39, Laws of 1931). In sec. 1 it authorized the city to sell the civic center site to the government and in secs. 2 and 3 provided as follows:

"§ 2. Such sale and conveyance shall be on such conditions and such terms as in the judgment of the commissioners of the sinking fund shall be deemed proper.

"§ 3. The land so transferred to be used by the United States government for the construction and erection of a new federal court house in and for the southern district of New York, in connection with an agreement between the city of New York and the United States government for the removal of the old federal building at the southerly end of City Hall park in the borough of Manhattan, and the acquisition of a new site in said borough by the United States government for the construction and erection of a new postoffice building."

On May 19, 1931, an assistant of the Mayor sent the Secretary a copy of this New York law advising him that there was no longer any legal obstacle to the consummation of the agreement to sell the civic center site to the government and on May 11, 1931, an Assistant Secretary wrote the Mayor accepting the offer to sell that site. This acceptance was sent to the Board of Commissioners of the Sinking Fund and was referred to the Deputy and Acting Comptroller for report. He submitted a report to that Board dated June 26, 1931, in which the negotiations were reviewed at length and the three letters of June 6th and 12th and December 6th, 1930, were quoted in full. The report stated that: "All of the foregoing is hereby recorded as a part of the agreement between the Federal Government and The City of New York, and the sale of the site for the new United States court house hereinabove described is made subject to these conditions."

The report was duly presented to the Board of Commissioners of the Sinking Fund at a meeting held on July 1, 1931, at which four of its five members were present when action thereon was taken and it was unanimously accepted. At the same time the Board, by resolution unanimously passed, authorized the conveyance by the city to the government of the civic center site upon the condition, among others not now material, " * * * that the United States will vacate and surrender to The City of New York, the present post office site in City Hall Park pursuant to the provisions of the general agreement reached by the said parties." This resolution set forth several bases for its action and among them the following which shows what was meant by "the provisions of the general agreement reached by the said parties" as used in the resolution.

"As a result of negotiations instituted by The City of New York to effect the removal of the old Federal post office building from its site at City Hall Park, the Federal Government has agreed (1) to convey to The City of New York the old Federal post office building and site in City Hall Park; (2) to purchase from the City, subject to the conditions as to easements, re-

moval of existing buildings, etc., as hereinafter set forth, for the sum of $2,450,000. the premises hereinafter described, as a site for the new Federal court house; (3) the Government is proceeding to acquire a new site for the post office on the property described as the Vesey street block, for the expense of which the City will repay to the Federal Government an amount in proportion to the area occupied by the present post office site as compared with the total area of the new post office building site."

The civic center site was thereafter conveyed to the government and the agreed purchase price paid to the city as before stated; and the government completed the acquisition of the Vesey Street site for the new post office by the purchase of twenty-two parcels in 1931 and the condemnation of two others later, all at a cost of $5,056,246. It built thereon the new post office building already mentioned which it occupied on or about September 1, 1937.

Meanwhile the Mayor of the City on January 30, 1936, wrote to the Secretary suggesting the beginning of the tearing down of the old building before the removal of the post office saying in part, "I understand that applications are being made by other Federal departments to move into the old Post Office building. Please do not permit this to happen. I would like to get your permission to start tearing down the old Federal Post Office building even before the Post Office is moved; by that I mean we could take down the upper stories so that there would be no danger of this ugly eyesore remaining there for another generation." To this letter the Secretary replied to the effect that the old building was being used by the government in accordance with the terms under which it acquired the site; called attention to the agreement of the city to pay a portion of the cost of the site for the new post office; said the old building would be required for government use until the new building was completed and that the latter would not be ready for occupancy for about a year; and further stated that when the new building was ready for occupancy the old building and site would be conveyed to the city upon payment of $4,336,985.79 which was the amount computed on the basis of proportionate areas. The Mayor replied to the Secretary expressing surprise and disappointment at hearing that the government expected payment for the conveyance of the old post office site to the city and indicated his intention to have introduced in Congress "necessary legislation permitting reconveyance of this site to the City in accordance with the original agreement." It was after that, under the stipulation of the parties already mentioned, that the building was vacated by the government and demolished by the city at its own expense, and the site added to City Hall Park.

It seems appropriate to deal first with the city's contentions that regardless of the authority of those undertaking to act for it in the negotiations no binding contract was ever made concerning the acquisition by the city of the old post office site because (1) the writings relied upon were too indefinite and lacking in detail and (2) they were insufficient to satisfy the Statute of Frauds.

From what has been set forth herein it seems clear that from the beginning the government was mainly, perhaps wholly, interested in securing adequate court and post office facilities and there is not the slightest reason to believe that it could not have obtained them by erecting a new building on the old post office site. Indeed, it is plain from its insistence that the new post office site be near the old, that the old was considered a good location. It is equally clear that the city wanted the site added to its park and not used by the government for any building. It is plain also that the government was willing to treat the acquisition of a new site for a court house as a matter separate from a new one for a post office and the vacating and conveyance of the old site to the city but that the city insisted upon treating these three things as parts of one whole and the city's way in that regard was adopted and followed. The long drawn out negotiations and the persistence shown in getting the old site transformed into condition for park use leave no doubt of the intention of the city's negotiators to have the city bound by the agreement when reached and of course the government's intention to be bound is undisputed. The Mayor and the Secretary wrote in terms of offer and acceptance and both refer to the agreement. So far as intent to make a contract is concerned the proof is ample.

■■ Nor can there be doubt as to the necessary completeness of statement as to the details. As might be expected in an undertaking of this magnitude, not every

minor point was definitely agreed upon and that agreement expressly stated. The matter was too complicated for treatment simply upon an "I offer" and "I accept" basis. The Mayor referred to the acquisition of the land for the new post office site by condemnation and the Secretary by purchase, condemnation or otherwise. Yet there is nothing to suggest that either was really concerned with the precise manner of its acquisition and no reason to believe that it was not obtained by purchase in part and by condemnation in part at a fair price. No mention was made of the kind of deed to be executed by the government when it conveyed the old post office site to the city and it turned out that it would have to be a quit-claim deed; it was also plain that that was of little consequence since the government's title had been acquired from the city itself and a quit-claim deed would put its title where it was before the government obtained its interest in the land. This agreement, of course, contemplated the conveyance of a good title to the city and there was no need for describing how that would be accomplished. The negotiators did not agree whether the government or the city would pay the cost of tearing down the old building and that was made a point of some controversy in the correspondence between the Mayor and the Secretary. The resolution of the Board of Commissioners of the Sinking Fund construes the agreement to be for the conveyance of the "old Federal post office building and site" which is probably what all concerned understood since the Secretary in his letter of June 12, 1930, spoke of conveying the "old Federal building and the site thereof" to the city and the Mayor did not express any dissent. However, we need not be concerned with that for in a contract involving expenditures of several millions of dollars it was a minor detail. As such it was not essential that it be resolved before the contract became binding and enforceable. N. E. D. Holding Co. v. McKinley, 246 N.Y. 40, 157 N.E. 923. The cost of demolition was allowed the city in the decree and as the government took no appeal we refrain from expressing our views as to the propriety of that. It is enough for the purpose of deciding that the contract expressed a final binding agreement that the parties set forth and agreed to all but the comparatively insignificant details as to which they were bound to reach a reasonable understanding if and when they should require attention.

As for the objection based upon the Statute of Frauds it is enough to say that as the scope of the letters is sufficient to show the consummation of an agreement the writings by the same token are ample to satisfy the statute. The whole contract was set forth in a way to enable one to determine from the writings what it was without the aid of parol evidence and that was all the statute in New York required. DeGoode v. Burton, 141 App.Div. 22, 125 N.Y.S. 662; Ward v. Hasbrouck, 169 N.Y. 407, 62 N.E. 434.

After deciding so much, the trial judge held that the representatives of the city were adequately shown to have been authorized to contract in its behalf. He put this on the ground that the action of the Board of Estimate and Apportionment, which under the city's charter had to authorize the purchase of land but could, under its own rather elaborate rules, act in that regard only at a public session, and it did not so act, and only in accord with certain formalities, which concededly were not followed, should be presumed to have suspended its rules as it might by a three-fourths vote and have lawfully voted the needed authorization as the Mayor had written the Secretary. His conclusion was summed up as follows: "If the board wished to act in camera, as it could legally, there was no better reporter of what had transpired than the Mayor, who presided. The Mayor's report of what had happened, never questioned by any member, is satisfactory evidence of the Board's approval." This evidently referred to the Mayor's letter to the Secretary already quoted. We cannot agree that mere presumption in such circumstances can support so heavy a burden. Public policy requires that municipal corporations be bound by contracts made by those who undertake to represent them only when such contracts are in fact duly authorized. Seif v. City of Long Beach, 286 N.Y. 382, 36 N.E.2d 630; Scarborough Properties Corp. v. Village of Briarcliff Manor, 278 N.Y. 370, 16 N.E.2d 369. When the due authorization of such a contract is in issue it simply begs the question to presume regularity when the prescribed course has not been followed. Actual and adequate proof that the Board of Estimate and Apportionment did suspend its rules to enable it to act in secret, or so-called executive, session was needed to support the contract's validity in so far as it was dependent upon action by that body.

In this instance the need for action by that Board was removed by the special act of the New York legislature above mentioned. By that special law the Board of Commissioners of the Sinking Fund were given authority to authorize the sale of the civic center site "on such conditions and such terms" as in their judgment shall "be deemed proper." In § 3 of the special law it was made clear that the sale of this land to the government was "in connection with an agreement" for the removal of the old post office building and the acquisition by the government of a new site for the erection of a new post office building. This special act superseded the city's charter, itself but a legislative act subject to amendment by the legislature, pro hac vice and gave the commissioners of the sinking fund ample authority to authorize, as they did, the contract under which the sale of the civic center site to the government was made under the terms of the contract for acquisition by the city of the old post office site. The cash paid by the government was not all that it paid for the civic center site. The agreement to relinquish its right to use the old post office site was a part of the consideration. Nor was the city for that entire consideration merely to convey the court house site to the government. It was as a part of the same transaction to pay the government the amount involved in this suit. This was the agreement the commissioners of the sinking fund duly approved and ratified as a part of the terms and conditions of the sale of the civic center site. It was clearly within their power under the special act so to do when that act was passed, as it was, by a two-thirds vote of both houses on an emergency message of the governor. See § 2 of Art. XII of the New York Constitution 1894. Having elected to make this agreement not in the usual course in compliance with the provisions of its charter and the rules and regulations in force thereunder but instead to proceed in accordance with a special act whose provisions were duly followed, the city became bound by its contract and the disregard of the usual procedure under the charter is of no consequence. Cf. McAneny v. Board of Estimate and Apportionment of the City of New York, 232 N.Y. 377, 134 N.E. 187, and People v. Bradley, 207 N.Y. 592, 101 N.E. 766.

Decree affirmed.