**FRANKLIN RESEARCH AND DEVELOPMENT CORPORATION, Plaintiff-Appellee,**

v.

**SWIFT ELECTRICAL SUPPLY CO., Inc., Defendant-Appellant.**

**No. 3, Docket 28799.**

United States Court of Appeals
Second Circuit.

Argued Sept. 21, 1964.

Decided Dec. 29, 1964.

John T. Moran, Jr., New York City (Clark, Carr & Ellis, New York City), for plaintiff-appellee.

Samuel Gottlieb, New York City (Gainsburg, Gottlieb, Levitan & Cole, Harry Giesow, New York City, of counsel), for defendant-appellant.

Before LUMBARD, Chief Judge, and MOORE and SMITH, Circuit Judges.

MOORE, Circuit Judge:

Defendant, Swift Electrical Supply Co., Inc. (Swift), appeals from a judgment of $24,970.62 awarded as damages for breach of contract in favor of plaintiff, Franklin Research and Development Corporation (Franklin) in a diversity suit after trial without a jury. Finding no error, we affirm.

Swift contends that no contract existed because the parties' communications expressed no meeting of the minds. It also argues that, assuming that a contract did exist, Franklin cannot recover the contract price because it disassembled the goods and sold various components.

Whether the law of New York or Connecticut applies need not be debated because the trial court concluded that in determining the validity of the alleged agreement "the result is the same under both New York law and Connecticut law."

Franklin is a manufacturer of electrical equipment. Swift is a wholesale dealer in electrical equipment. On April 16, 1959, Swensen, an electrical contractor, ordered 992 fluorescent light fixtures from Swift. These fixtures were to be installed by Swensen as ceiling lamps in a shopping center under construction at Wallkill, New York. The delivery date was "To be agreed upon Approximately ½ on June 15th." Swift communicated with Franklin as to manufacture of the fixtures and, after obtaining a satisfactory price, it asked to examine a sample.

On May 22, 1959, Robinson, a salesman for Franklin; Sodora, the president of Swift; Hennessey, a branch manager for Swift; and Swensen met at Swift's warehouse in Nanuet, New York, to examine the sample fixture supplied by Franklin. At this meeting Sodora signed an order for the purchase of the fixtures. No delivery date was specified in the order, which read in part as follows:

"992 4x4' RSD 640 Plastic Louvers 6/40 WRS ETL 227 Volt Universal Ballasts. To be supplied with necessary haging [sic] satisfactory to contractor. Louvers supplied with vinyl strips installed 42.50 ea.

"2%10. Net 30.

" 'Subject to Final Approval by Owner.'

"As per [Franklin's] sample #F3967."

*   *   *   *   *   *

"Acknowledgement of this order is requested—advise shipping date."

This order was acknowledged on May 29, 1959 by Fullerton, the manager of Franklin's Norwalk branch. The acknowledgment contained the following terms:

"Ship by: Truck Prepay and Allow 1% 10th and 25th. Net 30 days.

*   *   *   *   *   *

"RSD 640 LF 4x4 white plastic louver shielding with vinyl hinges. 277 volt ballasts. Fixture depth 3¾" same as sample supplied on our F-3967.

Note: Wireways covers to be packed separately and not installed in fixtures.

Ceiling construction to be advised.

Note: Upon release of this order by you at least 60 to 90 days will be required for fabrication and shipment."

However, this acknowledgment was rejected by Swift on the ground that Franklin's reply did not reflect the correct cash discount to be given Swift. On June 20th Franklin sent Swift a corrected acknowledgment showing the discount to be "2% 10th and 25th—net 30 days". This second acknowledgment was never answered by Swift.

On August 18, 1959 and on September 15, 1959 Franklin wrote Swift requesting a definite delivery date, since Franklin desired to fit the order into its production schedule. In the letter of August 18th, Franklin also requested information as to the type and construction of the ceiling mountings desired for the fixtures. Since Swift never replied to these requests, Franklin put the order into an "indefinite hold" category until October 1959.

On October 13, 1959 Swift delivered to Franklin the following:

(a) A detailed delivery schedule and a request to proceed with manufacture of the fixtures. (The delivery schedule called for delivery of one-third of the fixtures on December 1, 1959, one-third on January 1, 1960 and the remainder on February 1, 1960.)

(b) Instructions concerning the construction of the ceiling mounts and hangings for the fixtures coupled with a request for certain structural modifications in the fixtures to conform to the hanging instructions.

(c) A request from Swensen to reduce the number of fixtures to 842, was granted. All other details of the transaction were to remain as outlined in the May and June communications.

Franklin proceeded to manufacture the fixtures and to order ballasts and plastic louvers for them. On December 15 Swift

notified Franklin that the Wallkill project was behind schedule and that delivery of the fixtures should be suspended. However, no request was made to stop production.

About December 21st Swensen called Franklin to advise Franklin not to release any fixtures and not to proceed with the manufacture of any more than were in stock. On December 23rd Robinson received a letter from Swensen confirming the request to halt delivery on the first lot of 600 fixtures which Swensen "understood to be ready." A new delivery date was given of approximately February 15, 1960, but Swensen advised Franklin to resell the first lot of fixtures if Franklin had "another order" and that in the event of resale Swensen was willing "to take delivery as your [Franklin's] production warrants it." This letter further requested that a "stop" be put on production of the second lot of 242 fixtures.

Franklin packed all 842 of the fixtures during January 1960. By this time ballasts had been installed in each fixture and they were ready for delivery with the exception of the louvers which had been cancelled by Franklin after learning of the delay in the delivery date of the fixtures. Since Franklin had no storage room at its Norwalk plant, the fixtures were placed in a nearby public warehouse to await further instructions from Swift or Swensen.

On February 23, 1960 Franklin wrote Swift to advise that the fixtures had been placed in storage and requested a definite new delivery date. On March 7, 1960 Swift was again advised that the fixtures were in storage.

On March 7, 1960 Swift called Franklin to advise that the entire order would have to be cancelled due to the precarious financial condition of the Wallkill shopping center. This conversation was confirmed by Sodora in a letter to Franklin requesting that a "cancellation charge be submitted before any extra charges are added to those already owed."

On March 31, 1960 Franklin again advised Swift that the fixtures were completed and in storage at Norwalk. Franklin also stated that the fixtures could not be readily resold since they "were not a standard catalogue item," but that all possible efforts would be made to assist Swift in finding another buyer. Franklin further demanded payment for the fixtures.

Franklin paid storage charges on the fixtures up to July 1, 1960 and for the removal of the goods plus the transportation charges to Franklin's Massachusetts plant where Franklin had available space of its own. In addition, Franklin sold all of the ballasts at cost. It could sell only 121 of the fixtures, however, and these were sold only after modifications which cost Franklin from $31.48 to $39.96 per fixture.

■■ Swift argues that the parties never entered into a binding agreement since Franklin's acknowledgment of Swift's order was in itself a counteroffer and thus an implicit rejection of the terms of the offer and emphasizes the variations between the order of May 22nd and Franklin's acknowledgment. For example:

(a) Swift's order states that it is "subject to approval of the owners" while Franklin's reply is silent on this point. However, the trial court found that Swift and Swensen represented that the owners had delegated power of approval to the intermediate purchasers. Thus final approval of the owners "was not a condition precedent which prevented consummation of the agreement"[1] since Franklin was led to believe that such approval had already been secured.

(b) Swift's order states that the fixtures are to be supplied with "necessary hagings [sic] satisfactory to contractor" while Franklin's acknowledgment states that the "ceiling construction" of the fixtures was "to be advised." Here Franklin simply appears to have echoed Swift's original thought. This interpretation seems reasonable in view of

1. Franklin Res. & Dev. Corp. v. Swift Elec. Supply Co., 236 F.Supp. 992 (S.D.N.Y.1964).

the fact that the parties left the meeting of May 22nd having failed to settle the details of the construction of the hangings for the fixtures, and that it would be natural for them to confirm the existence of this open term in their communications.

■ Swift also argues that it was industry practice to regard a transaction as incomplete until a release to begin production had been given, and that the agreement reached by the parties in May 1959 was thus "no more than tentative" until Swift gave such a release.[2] But delivery instructions were at most an "open" term to be settled by subsequent negotiation within the context of an already binding contract,[3] and a definite schedule was given on October 13th. Moreover, the October 13th modification itself can stand as an independently enforceable contract of sale; the terms not discussed at that meeting can be incorporated from the May and June communications, to which the parties obviously referred, even if the earlier communications failed to create an enforceable contract.

■ In any event Swift's arguments as to the tentative or indefinite character of the terms in the original agreement are vitiated by the trial judge's findings that this agreement was modified by the parties and that a definite delivery schedule was given at the meeting on October 13, 1959. Thus the original omission of a delivery schedule is immaterial if the outcome of the October meeting is seen as a mere modification of an originally enforceable contract since the parties supplied the missing term. Furthermore and despite any defect in the original agreement, the parties concluded a contract enforceable in the first instance if the result of the October meeting is viewed as itself an independently enforceable contract of sale incorporating the balance of the terms originally agreed upon in May and June of the same year.[4]

2. Swift contends that the trial court erred in its decision to bar proof of industry custom to clarify the meaning of the term "release" as used in the agreement. While custom or usage may often be used to clarify ambiguities or to "fill gaps" in an agreement, 1 Corbin, Contracts, §§ 95–102 (1963), such parol evidence should not be used to overcome the independently expressed intent of the parties.

3. "If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice between conflicting meanings and the filling of some gaps that the parties have left." 1 Corbin, Contracts, note 4, supra at 400.

   In some instances, the courts have simply construed a possibly defective contract to establish its validity. Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., 232 N.Y. 112, 133 N.E. 370 (1921); Strang v. Witkowski, 138 Conn. 94, 82 A.2d 624 (1951). In other cases the courts have viewed a series of communications as a whole and have filled "gaps" in an agreement in order to uphold the contract, United States v. City of New York, 131 F.2d 909 (2d Cir. 1942), cert.

denied 318 U.S. 781, 63 S.Ct. 858, 87 L.Ed. 1149 (1943) or the more important gaps in an agreement have been filled by inferring a promise from a party to perform within a "reasonable time" or to use "reasonable efforts" to carry out his obligations. Atlantic Terra Cotta Co. v. Chesapeake Terra Cotta Co., 96 Conn. 88, 113 A. 156 (1921); Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214 (1917). Gaps or omitted terms in an agreement may also be filled or given practical construction by the subsequent conduct of the parties particularly if, as in the present case, the parties originally intended to leave the matter for future agreement. Roessler v. Burwell, 119 Conn. 289, 176 A. 126 (1934); Rubin v. Dairymen's League Co-op Ass'n, Inc., 284 N.Y. 32, 29 N.E.2d 458 (1940).

4. Swift argues that the agreement does not satisfy the statute of frauds. However, the agreement satisfies both the Connecticut and New York statutes of frauds on several grounds. Conn.Stat. Ann. § 52–551; N.Y.Personal Prop.Law McKinney's Consol.Laws, c. 41, § 85. First, the communications between Swift and Franklin may be read together to satisfy the statute. Kulmacz v. Milas, 108 Conn. 538, 144 A. 32 (1928); Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 110 N.E.2d 551 (1953); Ber-

The offer and acceptance are not required to meet with geometric precision in order to form a valid contract. In the present case, the parties consistently acted as if they had made a binding agreement, and Franklin should not be penalized for the failure of the parties to draft their communications with the niceties of contract law foremost in their minds. United States v. City of New York, 131 F.2d 909 (2d Cir. 1942), cert. denied 318 U.S. 781, 63 S.Ct. 858, 87 L.Ed. 1149 (1943).

The trial court awarded Franklin $20,265.62 in damages. To the contract price of $35,785.00 the court added storage charges of $688.85 and moving expenses of $802.42 incurred by the seller. Credits were then allowed as follows:

(a) $8,355.80 received by Franklin from the sale of the ballasts originally installed in the fixtures.

(b) $5,540.30 received by the seller from the sale of the plastic louvers originally ordered by Franklin for installation in the fluorescent fixtures.

(c) $3,134.04 received by Franklin from the sale of 121 fixtures. This amount was computed through a credit of the modification cost of each group of fixtures plus sales commissions paid by Franklin against the total resale price of each lot sold by Franklin.

The Uniform Sales Act was in force in both New York and Connecticut at the time this agreement was made. Swift claims that, under the Sales Act, Franklin is entitled to recover only damages and that damages should be measured by the loss of a profit of four cents per fixture expected from the sale. Swift's contentions are only partially cor-

rect. There is considerable merit in Swift's argument that Franklin may not recover under the sections expressly providing for recovery of the contract price. Uniform Sales Act § 63; N.Y.Pers.Prop. L. § 144; Conn.Stat.Ann. 42–63. On the facts of this case, however, the distinction between an action for the contract price and action for damages is academic. Section 64(2) of the Uniform Sales Act, N.Y.Pers.Prop.Law § 145(2), Conn.Stat. Ann. § 42–64, which governs the latter, provides that the measure shall be "the estimated loss directly and naturally resulting, in the ordinary course of events, from the buyer's breach." In the usual case section 64(2) would require damages for breach of contract to be measured by a comparison of the contract price with the relevant market price at the time and place of performance or, in the alternative, at the time and place of resale if, as in the present case, the former measure of damages is not readily ascertainable. However, the facts of the present dispute reveal the foreseeable absence of a commercially feasible market [5] for the made-to-order fixtures and that resale would thus be impossible "in the ordinary course of events." Farish Co. v. Madison Distributing Co., 37 F.2d 455 (2d Cir. 1930). In the absence of any market value as a standard, an alternative measure of damages must be used which in this case can only be the contract price. Belisle v. Berkshire Ice Co., 98 Conn. 689, 120 A. 599, 34 A.L.R. 108 (1923); 3 Williston, Sales, § 583 (Rev. ed. 1948).

In this light, Swift's contention that Franklin may recover as damages only the expected profits from the sale of the fixtures is without substance and is at

man Stores Co. v. Hirsh, 240 N.Y. 209, 148 N.E. 212 (1925). In addition, the agreement is not subject to the statute if the October modification is seen as itself the final contract of sale since the contract would then be performable within one year. Finally, the contract is not subject to the statute since (in the words of the statutes of both states) the fixtures comprising the subject matter of the agreement were "to be manufactured

by the seller especially for the buyer and are not suitable for sale to others in the ordinary course of the seller's business * * *"

5. In the present case a limited market existed for the resale of the fixtures but the costs of conversion and the lack of success in discovering potential purchasers created the equivalent of the total absence of a resale market.

variance with elemental principles of contract law because the measure of damages advocated by Swift would in the present case deny Franklin compensation for justifiably incurred expenses of manufacture plus storage and moving charges.

Affirmed.