**In re The MONETARY GROUP, The Securities Groups, The Securities Groups 1980, and The Securities Group, Debtors.**

**Bankruptcy Nos. 84–428–BK–J–GP, 84–430–BK–J–GP, 84–431–BK–J–GP and 84–433–BK–J–GP.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

July 9, 1990.

George E. Ridge, Jacksonville, Fla., for post-confirmation administrator.

William D. Brinton, Jacksonville, Fla., for claimant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This case is before the Court upon objection by the post-confirmation administrator, Louis Lowin ("objector") to claims filed by Leonard C. Levie ("Levie") in the following estates: The Securities Group, number 26; The Securities Group 1980, number 47; The Monetary Group, number 37; The Securities Groups, number 26.

Upon the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Claimant is a graduate of the Baltimore Polytechnic Institute, Johns Hopkins University and the Harvard Graduate School of Business. After graduation, he was employed by Lehman Brothers, specializing in the trading of United States government bonds with long-term maturities and the corresponding financial futures traded on the Chicago Board of Trade. Subsequently, Lehman Brothers created an Arbitrage Desk for him in United States government securities.

2. Levie left Lehman Brothers at the end of 1978 after having been contacted by Charles Atkins ("Atkins") and Kenneth Kaltman ("Kaltman") to join them in a new enterprise to be known as The Securities Group ("TSG"). He agreed to leave Lehman Brothers based upon TSG's offer of a 3 year employment contract which included a base salary and a formula for determining a bonus based upon net trading profits.

3. Levie joined TSG in the early part of 1979. The terms were initially set forth in a written employment agreement dated December 1, 1978, and were modified in a revised agreement dated October 1, 1979. At the same time, TSG employed two other traders, Joseph Riley and Richard Gonzales. The five traders were thus Levie, Gonzales, Riley, Kaltman and Hageman. Kaltman and Hageman later became general partners in The Monetary Group ("TMG") and The Securities Group 1980 ("TSG80").

4. Concurrent with the formation of TMG in October, 1979, Levie entered into employment agreements with TMG and made a revised employment agreement with TSG. These employment agreements were virtually identical with those of the other traders, differing only on the percentage of compensation received from a bonus pool. Levie's agreements provided for "3% of net trading profits" as incentive compensation.

5. Shortly after entering into the revised agreement with TSG and the new agreement with TMG, a joint venture known as The Securities Groups (Groups) was formed as a general partnership under the partnership laws of the state of New York.

Groups was created to pool the assets of TSG and TMG so that those assets could be traded cohesively and to eliminate dispute among the limited partners as to which partnership received certain profits or losses.

6. After the formation of Groups, Atkins and Kaltman told Levie that Groups was formed as a joint venture between TSG and TMG for the purpose of trading. They further informed him that he would act as a trader for Groups, that all his trades would be through Groups, and that Groups would be shown at the top of each trading ticket. All paperwork generated by buying, selling and confirming trades would be in the name of Groups. Levie was considered a treasury bond trader for Groups.

7. The Joint Operating Agreement scheduled the terms and conditions under which TSG and TMG would conduct their businesses and provided that as general partners TSG and TMG would participate proportionately relative to their capital accounts.

8. Prior to the formation of Groups, Levie received his remuneration from TSG. After the formation, Levie and other traders received pay and bonuses from Groups. Also after November 1, 1979, the trading and other activities of the general partners of Groups were conducted through Groups.

9. Groups, as a New York general partnership, made bonus payments to traders, for which there was a charge back to the general partners pursuant to the joint operating agreement.

Under the joint operating agreement, the component partnerships of Groups had "unlimited liability for the repayment, satisfaction and discharge of all debts, liabilities, and obligations incurred in connection with the operation of the joint operating account."

10. In November, 1980, a new limited partnership, known as The Securities Group 1980 (TSG80), became a general partner of the joint venture Groups. TSG80 was allocated a specific percentage interest in the general partnership entity. The profits, losses and tax items of Groups were to be shared pro-rata amongst the general partners in proportion to their relative capital assets.

After TSG80 was added to the joint venture, Levie's activities changed only to the extent that he traded with larger volume and with the associated greater risks.

11. When TSG80 was created, Levie was informed that an additional fund of money was coming into Groups, and that it would be his responsibility as a trader to continue to trade with increased volume within Groups. When Levie questioned Kaltman (a general partner of TSG80) whether his base salary would change and bonus computation would change, he was told that his salary would remain the same, but that the bonus calculations under the existing employment agreements would be applied against the combined results of all the partnerships, including TSG80.

12. Levie was employed by TSG80 from November, 1980, to September, 1981, for which there was no written employment agreement. However, he still worked under the TMG and TSG agreements, the only exception being that his bonus would be based on net operating profits including TSG80. The general partners of TSG80 agreed that the net trading profits of TSG80 would be included in determining the traders' bonus pools for 1980 and 1981.

13. Richard Gonzales ("Gonzales") was a bond trader and employed under agreements substantially similar to those of Levie, including a base salary and a bonus of 3% of net trading profits. Gonzales received the following annual bonuses: 1979 —$60,000; 1980—$200,000; 1981—$375,000. For the same periods Levie received: 1979—$60,000; 1980—$100,000; and 1981 —$0.

14. Levie upon receiving his 1980 bonus of $100,000 requested a copy of the bonus calculation. He was allowed to review numerous documents and informed that if he had any problem with the calculation it would be cause for termination. General partners Gubitosi and Kaltman further informed Levie that he would not be provided with a written copy of the calculation. To date, Levie has never received a calculation.

15. Clause 8(a) of Levie's employment agreements with TSG and TMG provides in relevant part:

The Company's independent Certified Public Accountants shall compute Net Profits from Trading in accordance with generally accepted accounting principles utilized by firms in similar businesses and this Paragraph. A copy of the computation of Net Profits from Trading shall be provided to the Employee as soon as possible after the close of the fiscal year, but in no event later than six (6) months after the close of the fiscal year for review and verification, including the right, at Employee's expense to audit the books of the Company provided, however, if any, material error is discovered, such expense shall be that of the Company.

16. Contrary to these terms, the bonus calculation resulted solely from decisions of Atkins, Hageman, Kaltman, and Gubitosi.

17. In the spring of 1981, Levie was advised in writing by Kaltman (a general partner of TSG, TMG, and TSG80, and partner in charge of the trading room of Groups) that Levie's employment agreements would not be extended beyond December 31, 1981, and future employment would be orally and at will.

18. On September 9, 1981, Levie discussed with Atkins the idea of forming his own investment firm to trade stock options. Atkins did not discourage Levie from leaving. He told Levie that he was pleased with his performance during the preceding years and that there was no problem with Levie establishing such a firm. Atkins extended his best wishes and offered to help Levie in any way he could. Atkins stated that any compensation due Levie would be honored.

The next day Levie terminated his employment relationship with Groups, TSG, TMG, and TSG80. On September 12, 1981, Levie confirmed the substance of the September 9, 1981, meeting with Atkins.

19. Levie's employment agreements do not bar him from terminating his employment prior to December 31, 1981.

20. At the end of 1981, Levie and others formed a partnership known as Options Arbitrage Group, whose principal area of trading was stocks and stock options. The partnership obtained a seat on the American Stock Exchange. There were no common investors with this entity and Groups. In late 1982, Levie and others formed a second partnership, Financial Options Associates. This partnership did include some investors common to Groups.

21. Clause 6 of Levie's employment agreements with TSG and TMG provide as follows:

Except as above provided, during the period of his employment, the Employee shall not, directly or indirectly, alone or as a member of a partnership or association, or as an officer, director, or stockholder of any corporation, be engaged in or concerned with any other commercial or business duties or pursuits except with the prior written consent of the Managing Partner.

This restrictive covenant is limited to the period of employment. There is no restriction on post employment commercial pursuits.

22. Even if there is a covenant not to compete, the new partnerships with TSG, TMG, TSG80, or Groups were not in competition because they traded in stocks and stock options and not government securities.

23. Additionally, even if a violation of a restrictive covenant occurred during the period of Levie's employment, there is no bar in the agreements to the payment of bonuses. Groups and its component partnerships may have sought injunctive relief and damages. However Groups, TSG, TMG, and TSG80 have not claimed any setoff in this litigation and have not offered proof of damages to support a setoff to the bonus claims.

24. In the spring of 1982, Kaltman told Levie that he would not receive a bonus for 1981. In 1983, Levie initiated an arbitration proceeding in connection with his claims for unpaid bonuses. The arbitration hearing was scheduled but not heard due to the automatic stays associated with the bankruptcy filings of Groups, TSG, TMG, and TSG80.

25. The employment agreements do not make provisions specifically for the situation where employment terminates in the middle of a year. The agreements provide that the bonus is to be pro-rata of the 3% net profits from trading, i.e., the portion of the 3% bonus derived from the number of days in the fiscal year which have elapsed prior to termination, as it relates to 365 days.

## CONCLUSIONS OF LAW

■ Levie's employment agreements with TSG and TMG entitle him to 3% of the net trading profits of those entities, and he is not barred under New York Statute of Frauds [§ 5–701(a)(1), New York General Obligations Law] from asserting claims against Groups or TSG80.

Groups acknowledged in writing that Levie was in its employ under the joint venture, and its payments of salary and bonus compensation to Levie and the other traders is referable to oral agreements and representations made by its general partners. The statute of frauds does not apply if the agreement or some note or memorandum is in writing and subscribed by the party to be charged therewith or by its lawful agent. *See*, § 5–701(a)(1), New York General Obligation Law.

It is well settled that no particular form of language is necessary to constitute a sufficient note or memorandum, and it may consist of a number of writings sufficiently connected as to warrant their being read together as one to satisfy all the requirements of the statute. *Franklin Research & Develop. Corp. v. Swift Elec. Sup. Co.,* 236 F.Supp. 992, 1003 (S.D.N.Y.1964), *affirmed* 340 F.2d 439 (2nd Cir.1964). The

writing need only amount to an acknowledgement of an obligation. *See, Torreggiani v. Coffee of Colombia, Inc.*, 49 Misc.2d 785, 268 N.Y.S.2d 649, 652 (N.Y. City Civ.Ct.1965). The letters to Levie from the general partners of TSG, TMG, and TSG80, sufficiently acknowledge the employment agreements and their applicability to TSG80.

The fact that Levie accepted salary and bonus checks for the years 1980 and 1981 does not bar him from seeking recovery. Levie was never presented with an accounting as required by the employment agreements and was threatened with termination when he sought it. The rendition of an account without an acceptance by the other party does not constitute an account stated, and a contention that a transaction amounted to an account stated is without merit if no account was presented. *Waldman v. Englishtown Sportswear, Ltd.*, 92 App.Div.2d 833, 460 N.Y.S.2d 552 (1st Dept.1983). The mere acceptance of checks for compensation does not amount to an account stated. *Pospicil v. Hammers*, 148 Colo. 207, 365 P.2d 228, 229 (1961).

Even where there has been a previous assent to an account stated, a party may attack the balance shown in the account by evidence of errors. *Navimex, S.A. De C.V. v. S/S Northern Ice*, 617 F.Supp. 103, 106 (S.D.N.Y.1984). *See also, Simmons v. Santoro*, 36 Misc.2d 409, 232 N.Y.S.2d 602, 605 (N.Y.Sup.1962); 1 Am. Jur.2d *Accounts and Accounting* § 36. The evidence at trial showed that the method used originally in computing his bonus compensation was in error. Levie is entitled to bonus compensation utilizing the method provided for in the employment agreements.

The agreements in question clearly provide that a pro-rata bonus would be paid if the agreements were terminated "by death or otherwise." Levie's decision to leave Groups employ falls within this clause.

However, even if Levie breached the employment agreements, he may enforce the provisions relating to his pro-rata entitlement to a bonus, independent of any cause of action Groups might have for such breach. Even if one party's breach terminates a contract, a court will enforce contractual obligations if they provide what the obligations of the parties are upon termination. *See, Hustad v. Edwin K. Williams & Co.*, 321 So.2d 601, 603 (Fla. 4th D.C.A.1975). Under New York law, judicial eradication of rights clearly vested by the contracting parties as part of their bargain is disfavored. *Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 843–844 (2nd Cir.1975).

Where benefits are divisible, a party may claim compensation for that portion already performed. Where an employment contract has been drafted by the employer's counsel, any doubt as to its meaning should be construed to favor the employee, especially where the employer has failed to define the effect of an employee's breach. *See, Bird v. Computer Technology, Inc.*, 364 F.Supp. 1336, 1344 (S.D.N.Y. 1973). *See also, Dour v. Village of Port Jefferson*, 89 Misc.2d 146, 390 N.Y.S.2d 965, 968 (1976); *Stern v. Satra*, 539 F.2d 1305, 1310 (2nd Cir.1976); and Restatement of Contracts (Second), § 240. This Court concludes that Levie is entitled to a pro-rated portion of the bonus compensation for the fiscal year 1981.

Based upon the evidence presented, the bonus due Levie, calculated at 3% net trading profits, are as follows:

| | 1980 | | 1981 (prorated) |
|---|---|---|---|
| TSG | – $ 44,700.00 * | TSG | – $ 43,703.01 |
| TMG | – 97,190.00 * | TMG | – 268,763.18 |
| TSG80 | – 4,410.00 | TSG80 | – 70,670.47 |
| TOTAL | $146,300.00 | TOTAL | $388,136.66 |

* Bonus due is $197,190.00, minus $100,000.00 payment by TMG in 1980.

The total bonus owed to Levie (less the $100,000.00 payment by TMG for 1980), for the years 1980 and 1981, by Groups is $529,436.66, which is, the total of 3% of net trading profits of the constituent partnerships of Groups: TSG, TMG, and TSG80.

## CONCLUSION

The facts and the application of relevant law support Levie's claim for bonus compensation from the debtors. A separate

order overruling the objections will be entered consistent with these Findings of Fact and Conclusions of Law.