**FRANKLIN RESEARCH AND DEVELOPMENT CORPORATION, Plaintiff,**

v.

**SWIFT ELECTRICAL SUPPLY CO., Inc., Defendant.**

United States District Court
S. D. New York.
Jan. 10, 1964.

Clark, Carr & Ellis, New York City, for plaintiff; John T. Moran, Jr., David J. Sweet, New York City, of counsel.

Gainsburg, Gottlieb, Levitan & Cole, New York City, for defendant; Harry Giesow, Irwin Echtman, New York City, of counsel.

LEVET, District Judge.

This is an action for breach of contract for the manufacture and delivery by plaintiff of certain electric lighting fixtures to defendant. Jurisdiction is based upon diversity of citizenship. The case was tried to the court.

Proposed Findings of Fact, Conclusions of Law and the briefs of the parties having been received, the court, after considering the pleadings, evidence, exhibits, briefs and stipulations of the parties, now makes its Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Plaintiff is a Delaware corporation with its principal place of business in Boston, Massachusetts. At the time of the making of the contract a division of plaintiff, Wheeler-Fullerton Lighting Division, was located in Norwalk, Connecticut, where it manufactured lighting fixtures.

2. Plaintiff is not authorized to do business in the State of New York and has not sought such authorization although it has, over the years, employed salesmen in New York who solicited orders and maintained a listing in the

New York City telephone directory. (860–62) [1]

3. Defendant is a corporation organized and existing under the laws of New Jersey with its principal place of business in Union City, New Jersey.

4. Defendant is engaged in the electrical wholesaling business, selling manufactured products to electrical contractors, stores and others in New York and New Jersey. Defendant was and is qualified to do business, as a foreign corporation, in the State of New York.

5. In 1959, Roy Swensen, an electrical contractor, was doing business under the firm name and style of "Mehl Electric Company" at Pearl River, New York. As such, Swensen was performing electrical work in the construction of commercial and industrial building, including the furnishing and installation of wiring, fixtures, panels, etc. (627–28) Swensen had purchased electrical equipment utilized by him in such construction from the defendant for many years before and still continues to purchase such equipment from defendant. (664–67) On or about April 16, 1959, Swensen executed and delivered a purchase order to defendant (Ex. G.), whereby Swensen ordered:

"992   4 ft. × 4 ft. recessed fluorescent fixtures, 6-light 40W RS ETL 277 volt ballast, poly vinyl hinged louvre. Mfgr. to supply necessary mounting yokes satisfactory to the contractor and job conditions. $45.00 each.

"This order is subject to fixture approval.

"6 cuts and a sample are required."

The order provided that the fixtures were to be shipped ℅ Shoppers Paradise, Route #84, Wallkill, New York. The delivery date was "To be agreed upon Approximately ½ on June 15th." (Ex. G)

## I. NEGOTIATION AND FORMATION OF THE CONTRACT

6. In April 1959, Lucy M. Jehring, defendant's office manager, telephoned Louis A. Robinson, plaintiff's salesman, inquiring about the purchase of approximately 1,000 lighting fixtures. (39–41) Robinson referred the defendant to Lawson Fullerton, Vice-President of plaintiff's Norwalk, Connecticut plant. The defendant telephoned Fullerton and obtained a price of $42.50 per fixture for catalogue item RSD640.

7. At the end of April or the early part of May 1959, defendant telephoned Robinson and requested him to supply a sample fixture. (43–45) On or about May 12, 1959, defendant received at Union City, New Jersey, a certain electrical lighting fixture, described as "RSD 640 LP 4 × 4 white with plastic louvers, Fixture depth 3¾"." (Ex. 1; 6, 228)

8. On May 22, 1959 at defendant's warehouse in Nanuet, New York, the sample fixture was examined by Robinson, Anthony Sodora, defendant's President, Joseph Hennessy, the defendant's branch manager, and by Roy Swensen. This fixture was built to accommodate six 40-watt fluorescent lamps which are operated by three 40-watt ballasts or transformers. The fixture had a plastic louver which is a shielding element which eliminates part of the glare from the lamps. There were two louvers 2' wide by 4' long which were held in place by an inverted T rail located in the center of the fixture. (51–56, 503–504, 635–37, 639)

9. At the May 22, 1959 meeting, Robinson agreed to have plastic or nylon strips fastened to the edge of the fixture and clamped around the louvers so that the louvers could swing free when the fixture was relamped. It was also agreed that the ballast covers were to be shipped separately in order to save labor upon installation. (54–56, 874–75) Robinson was informed that it was not known in what type of ceiling the fixtures were to be installed.

---

1. All numerical references are to the stenographer's minutes of the trial.

10. After examining the fixture, Robinson, Swensen, Hennessy and Sodora went to Hennessy's office where Robinson prepared a purchase order. (57) This purchase order (No. 28380) was signed on May 22, 1959 at Nanuet, New York by Sodora, the defendant's President. Plaintiff's Exhibit 2, which is a copy of the purchase order, was then given to Robinson. The text of the order (Ex. 2) reads as follows:

"992—4 × 4' RSD 640 Plastic Louvers 6/40 WRS ETL 277 Volt Universal Ballasts. To be supplied with necessary haging [sic] satisfactory to contractor. Louvers supplied with vinyl strips installed 42.50 ea

"2% 10 Net 30.

"Subject to Final Approval by Owner.

"As per sample our #F 3967."

11. The phrase "Subject to Final Approval by Owner" was put on the purchase order at Sodora's request. However, both Swensen and Sodora told Robinson that Swensen had "more or less the final decision on the type of fixture that was going on the job." (61–62, 157) There was no conversation (on May 22, 1959) about the owner. (62, 158) The description "As per sample our #F 3967" was written on the purchase order by Robinson. The reference number (F 3967) is the number appearing in Plaintiff's Exhibit 1, the invoice for the fixture that had been examined in the warehouse. This was done after Sodora signed the purchase order but Robinson made this notation in the presence of Sodora, who saw Robinson write it in but who made no comment (71–72) although he was sitting on Robinson's right at the desk. (153) [2]

12. The depth of the fixture that was examined on May 22, 1959 prior to the preparation of the purchase order was 3¾". (62–63) At this time (May,

1959), the Fullerton Manufacturing Company had a catalogue (Ex. 25) in use which depicted a fixture known as The Wellesley RSD 640 whose dimensions were 48" × 48" × 7". The catalogue did not show a fixture having the same dimensions as the one examined on May 22, 1959. (64–67) The defendant's President, Sodora, conceded that he had ordered a fixture with a 3¾" depth and not a fixture with a 7" depth, depicted in plaintiff's catalogue (Ex. 25). (546–47)

13. While the purchase order was being prepared, Swensen told Robinson that delivery (of the fixtures) would be around October, 1959. (73) After Robinson left defendant's office in Nanuet, he mailed the purchase order (Ex. 2) from his office in Newark, New Jersey to plaintiff's plant in Norwalk, Connecticut. (74)

14. On or about May 29, 1959 the plaintiff mailed to the defendant plaintiff's acknowledgment referring to defendant's purchase order No. 28380. Plaintiff's Exhibit 3 is plaintiff's copy of the acknowledgment. The original of this acknowledgment was received by the defendant at its office in Union City, New Jersey. (8)

15. The acknowledgment (Ex. 3) reads as follows:

"RSD 640 LF 4 × 4 white with plastic louver shielding with vinyl hinges. 277 volt ballasts. Fixture depth 3¾" same as sample supplied on our F-3967.

"Note: Wireways covers to be packed separately and not installed in fixtures.

"Ceiling construction to be advised.

"Note: Upon release of this order by you at least 60 to 90 days will be required for fabrication and shipment."

16. Defendant's Exhibit E and plaintiff's Exhibit 2 contained the following

---

**2.** Although there may be some discrepancies between the testimony of Robinson and that of Sodora (and Swensen), I am inclined to accept the testimony of Robinson as the more reliable with respect to the happenings of May 22, 1959.

terms not appearing on plaintiff's acknowledgment (Ex. 3):

"To be supplied with necessary haging [sic] satisfactory to contractor

"Subject to final approval by owners

"2% 10 Net 30"

The reverse side of defendant's order (Ex. 2) provided a condition, among others, that the defendant had the right to cancel all or part of the order before shipment.

17. On June 4, 1959, Lucy M. Jehring, defendant's office manager, wrote to plaintiff. The letter (Ex. 3A) states:

"Acknowledgment does not cover all details as noted on our Order— Note change in Cash Discount. Please have corrected copy forwarded to us immediately."

18. Shortly after June 9, 1959, at Norwalk, Connecticut, the plaintiff mailed to the defendant in Union City, New Jersey a copy of plaintiff's acknowledgment (Ex. 4) of defendant's purchase order No. 28380. (Ex. 2) This acknowledgment was changed to show a 2% discount instead of a 1% discount as previously shown in the first acknowledgment. (Ex. 3) The change was made at the defendant's request. (231–32)

19. Plaintiff's Exhibit 4 (as did the first acknowledgment, Ex. 3) contained the notation that "upon release of this order by you, at least 60 to 90 days will be required for fabrication and shipment." This notation was placed on the acknowledgment because the defendant had not given an exact shipping schedule and was thus a notice to defendant that the plaintiff would need time to purchase materials to schedule fabrication and to make shipment. (259)

20. On June 20, 1959, the defendant received at its office in Union City, New Jersey a copy of the plaintiff's form of acknowledgment (Ex. 4) which refers to defendant's purchase order No. 28380. (9) Robinson did not receive any further communication from the defendant regarding the acknowledgments that had been issued in Norwalk. (78)

21. On August 18, 1959, plaintiff wrote to defendant. The letter (Ex. 5) was as follows:

"In reviewing our files we note that your order is still in a held for release status according to our records, with a tentative schedule of October of '59. Due to an unusually heavy schedule in our shop, available production time has already been fully allotted through the middle of October. Consequently, we would appreciate any more specific information as to your exact delivery requirements, so that we may place your order firmly in our schedule.

"We also wish to remind you that we will need to know the type of ceiling construction (and dimensions) into which the units will be recessed, since this makes a difference in the basic fabrication of the fixture and no work can be started until we know this."

About August 20, 1959, Robinson (who had received a copy of this letter) telephoned Hennessy and was told by Hennessy that he (Hennessy) did not know when a release would be given. (142–43)

22. On September 15, 1959, the plaintiff informed the defendant by letter that it had placed the "order in our indefinite hold status." The plaintiff also asked for a confirmation of this action and information concerning delivery date. (Ex. 5A; 11–12)

## II. THE MODIFICATION OF THE CONTRACT

23. On October 10, 1959 the defendant paid the plaintiff $44.50, the purchase price of the electrical fixture received by the defendant from the plaintiff on May 12, 1959 under plaintiff's invoice No. 16,566. ‚(Ex. 1; 12)

24. On October 11 or 12, 1959, Robinson received a telephone call from Hennessy who asked Robinson to come to Nanuet to discuss the details of the purchase order (Ex. 2) with the contractor, Roy Swensen. (79–80) On October 13, 1959 at the defendant's office in Nanuet, New York, Roy Swensen told Louis Rob-

inson that the number of fixtures originally ordered by the defendant was reduced from 992 to 842. This modification was made in a conversation between Robinson and Swensen. This conversation was in the presence of Anthony Sodora, President of the defendant, and Joseph Hennessy, the manager of defendant's office in Nanuet, New York, neither of whom indicated an objection to the modification on the part of the defendant. (79–81, 458, 599–600, 758–59)

## III. THE RELEASE (DELIVERY INSTRUCTIONS)

25. On October 13, 1959 at Nanuet, New York the defendant requested the plaintiff to make delivery of the electrical lighting fixtures ordered by the defendant to Shopper's Paradise, Route #84, Middletown, New York as follows: ⅓ of the lighting fixtures on December 1, 1959; ⅓ of the lighting fixtures on January 1, 1960 and ⅓ of the lighting fixtures on February 1, 1960. Defendant also requested the plaintiff to provide knockouts or holes in the top of the fixture so that it could be suspended by rods at the ceiling below the finished ceiling and furnish the defendant with a drawing giving the dimensions of the fixture so that the aperture in the ceiling could be properly constructed. These requests were made during the course of a conversation on October 13, 1959 at the defendant's office in Nanuet, New York. The requests were made by Roy Swensen to Louis Robinson, the plaintiff's representative, and were made in the presence of Anthony Sodora and Joseph Hennessy. (81–83) The rods to support the fixture were to be provided by the contractor, Roy Swensen. (894) Robinson was not given the name of the owner nor was he told who or what Shopper's Paradise was. (83) [3]

26. On November 6, 1959, Louis Robinson mailed to the defendant, at its office in Nanuet, New York, a drawing (Ex. 6) showing the mounting detail for the electrical lighting fixtures ordered by the defendant from the plaintiff. (85–86)

27. Prior to November 17, 1959, plaintiff ordered 3,100 Universal ballasts from Universal Manufacturing Corporation. These ballasts were the ballasts described by defendant in its purchase order. (Ex. 2, 24; 186; 265–66) The plaintiff received delivery of these ballasts on different dates from November 17, 1959 to January 28, 1960. (Ex. 24A–G; 190–95, 267–69)

28. On or about January 29, 1960, plaintiff, in a letter to Universal, cancelled the unfilled balance (400 ballasts) of its purchase order to Universal. (Ex. 24; 196, 270)

29. Between December 8, 1959 and December 11, 1959, plaintiff ordered 1,684 plastic louvers of the same type and description as those described by defendant in its puchase order (Ex. 2) from Sinko Mfg. & Tool Co. (hereinafter "Sinko") of Chicago, Illinois, of which 1,280 were to be shipped on January 1, 1960 and the balance on February 2, 1960. (See Ex. 20, 20A–B; 21, 198–200, 222–23) Sometime between the receipt of plaintiff's purchase order on December 10, 1959 and before January 1, 1960, Sinko was advised not to process the louvers because plaintiff's customer had requested a delay in the delivery of the fixtures to which the louvers were to be affixed and as a result no louvers were processed by Sinko under order No. 2920 prior to January 1, 1960. (224)

30. On January 20, 1960, the plaintiff shipped 1,684 pairs of metal hinge rails to Sinko to be used by Sinko to hinge the plastic louver so that the louver could be used in the fixture ordered by the defendant. (203, 224) However, by letter dated January 25, 1960 (Ex. 20C) plaintiff advised Sinko not to process the louvers under purchase order No. 2920 until released. Hence, Sinko kept this order on a hold basis to June 8, 1960, when Sinko was advised of its cancellation. (224, 225)

3. There are certain differences between Robinson's testimony and that of Swensen, Hennessy and Sodora with respect to the conversations of October 13, 1959. However, the testimony of Robinson is the more credible and I have accepted it.

31. By December 8, 1959, the plaintiff had completed purchases of all other materials (in addition to the ballasts and louvers) that were to be used in the fabrication and shipment of the fixtures ordered by the defendant. (206)

## IV. MANUFACTURE OF THE FIXTURES

32. The plaintiff commenced manufacturing 600 of the 842 fixtures ordered by the defendant during the week of November 24, 1959. The fabrication and painting of the fixtures and installation of electrical sockets was completed within two to three and one-half weeks after manufacture had begun. (282–85) By December 15, 1959, the ballasts that had been ordered by the plaintiff from Universal had been installed in 400 of the fixtures. (288) Ballasts were also installed in the remaining 200 fixtures (of the original 600) within a week after the ballasts arrived. (289)

33. The plaintiff commenced manufacturing the remaining 242 fixtures ordered by the defendant immediately after the shearing operation had been completed on the first 600 units (286) which took less than a week after this operation was started on November 24, 1959. (282) By December 15, 1959, these 242 units were in the process of being welded. Ballasts were installed in these units thereafter. (289)

## V. DELIVERY

34. On December 15, 1959, Robinson received a telephone call from Hennessy who advised Robinson that construction of the job (at Shopper's Paradise) was being delayed and that the plaintiff should hold up delivery of the fixtures. No request was made to stop production. (87) After his telephone conversation with Hennessy, Robinson sent a memorandum to plaintiff's factory in Norwalk. (89)

35. A day or two prior to December 23, 1959, Robinson received a telephone call from Swensen who advised Robinson that the job at Shopper's Paradise had been unavoidably delayed and that the plaintiff was not to ship any fixtures or to proceed any further with the manufacture of the fixtures. (93–95) Robinson then asked Mr. Swensen to write a letter confirming this request. (95–96)

36. Robinson received a letter from Roy Swensen, dated December 23, 1959, which he forwarded to the Norwalk, Connecticut plant. (Ex. 9; 12–15, 96) The letter stated:

"Due to an unavoidable delay in the construction of the above subject job we will not be able to accept the shipment of six hundred (600) fixtures which I understand are ready to be shipped. With the new schedule of construction it seems the job will be ready to receive them about the 15th of February.

"I realize this is an inconvenience to you therefore if you have another order for similar fixtures I suggest you release these fixtures and I will have to take delivery as your production warrants it.

"Please put a stop on the production of the balance of two hundred forty two (242) fixtures till further notice. I want to make sure as to the progress of the job before releasing them.

"Thank you for your kindness in this matter."

During a telephone conversation on March 7, 1960 with one of the plaintiff's officers, Robert Jewett, Sodora confirmed the fact that defendant "had put a hold on 242 of the fixtures at an earlier date." (405)

37. At all times during the personal negotiations between the parties, Swensen acted and was held out as an agent of the defendant. He advised plaintiff's representatives of the requirements, shipping instructions, deliveries and other matters relating to the order placed by defendant with plaintiff. (See Findings 8, 10, 11, 25)

38. The original order (Ex. 2) provided, among other things, that the fixtures "were to be supplied with necessary haging [sic] satisfactory to contractor." The acknowledgment (Ex. 3)

stated: "Ceiling construction to be advised," and the revised acceptance (Ex. 4) contained the same statement. On October 13, 1959, defendant requested plaintiff (a) to provide knockout or holes in the top of the fixture so that it could be suspended by rods at the ceiling below the finished ceiling, and (b) to furnish defendant with a drawing giving the dimensions of the fixture so that the aperture in the ceiling would be properly constructed. (81–83) Roy Swensen, the contractor, was to furnish the rods to support the fixture. (894) On November 6, 1959, plaintiff mailed to the defendant a drawing (Ex. 6) showing the mounting detail. (85–86) Thus the plaintiff adequately performed, and defendant's contention, that the contract was incomplete since the details of mounting were missing, is without merit.

39. During January 1960, all 842 of the fixtures were packed and made ready for shipment. (291–92; see Ex. 8) The louvers were not packed with the fixtures since the plaintiff, after being advised by the defendant to delay the delivery of the fixtures, had instructed Sinko not to ship the louvers. (224) In addition, on an order of this size, it was customary for the louver manufacturer to ship the louvers direct to the job. (298) Since there were no storage facilities in the plaintiff's plant in Norwalk for these fixtures (312) the fixtures and the wireway covers were placed in a public warehouse in Norwalk, Connecticut (294–95, 307, 320–21; Ex. 8A–H and 19), the first fixtures being delivered for storage on or about January 14, 1960. (294)

40. On February 23, 1960, Robinson wrote a letter to the defendant (Ex. 10), advising the defendant that the fixtures had been placed in storage and requested the defendant to advise the plaintiff when delivery could be expected. The defendant did not respond to this letter. (15–16, 96–97) On March 7, 1960, defendant was again advised that the fixtures were in storage. (406)

41. On March 7, 1960, Sodora wrote a letter to the plaintiff. (Ex. 11; 16–19, 406) With his letter Sodora enclosed several newspaper clippings (Ex. 11A) which reported the financial plight of Middletown Shopping Center, Inc. (18, 407) In his letter Sodora stated that "the Contractor, Mehl Electric had requested that this matter be taken under consideration and, if at all possible, a cancellation charge be submitted before any extra charges are added *to those already owed*." (Emphasis added.) On March 31, 1960, Jewett wrote a letter to Sodora (Ex. 12), advising the defendant that the fixtures were in storage and requesting payment for the fixtures. This letter was received by the defendant corporation. (18–19, 408) Not until the writing and mailing and receipt of the letter of March 7, 1960 (Ex. 11) did plaintiff receive notice of defendant's request to cancel the order placed by defendant with plaintiff. The previous notices of defendant after placing the order and fixing the dates of delivery were solely directed to a delay in delivery.

42. On the basis of the writings passing between the parties, I find that the parties entered into a contract whereby plaintiff agreed to manufacture, sell and deliver 992 electric lighting fixtures in accordance with specifications requested by the defendant and the defendant agreed to pay $42.50 for each fixture or a total of $42,160.00 (See Findings 6 through 20) This contract was subsequently modified by the reduction of the number of fixtures ordered from 992 to 842. (See Findings 23, 24)

43. The lighting fixtures were "manufactured especially for the buyer and are not suitable for sale to others in the ordinary course of the seller's business." The proof shows this to be true since at no time prior to the date of the defendant's purchase order (May 22, 1959) or at any time thereafter did the plaintiff manufacture or sell any lighting fixtures similar to those manufactured for the defendant. (298–300, 354) While the plaintiff did distribute a catalogue (Ex. A) to its customers in September 1959 which depicts a fixture similar to the one ordered by the defendant, such a fixture was never sold by plaintiff. (354)

## VI. DAMAGES SUSTAINED BY PLAINTIFF

44. On June 8, 1960, W. W. Sargent, President of plaintiff corporation, wrote a letter (Ex. 13) to Sodora, which again requested payment for the fixtures and for the storage charges. This letter was received by the defendant corporation. (19–20, 409)

45. Plaintiff paid Louis J. Gardella Inc. $688.45 in storage charges and $802.42 in freight charges for transporting the fixtures from storage to plaintiff's plant in Hanson, Massachusetts. (323–24, 411–12; Ex. 5, 16, 17, 18)

46. During the latter part of 1960 or the early part of 1961, plaintiff removed all the Universal ballasts from the fixtures manufactured by it under the defendant's order, there being three ballasts attached to each fixture, and sold the ballasts to its customers. It has been stipulated that the defendant be credited for each ballast $3.30, the amount paid by plaintiff to Universal. (See 374–76, 388–92, 394–95, 399)

47. Of the original 842 fixtures ordered by the defendant Swift, 721 fixtures minus the ballasts and the louvers are now in storage at plaintiff's plant in Hanson, Massachusetts. (395)

48. The balance of the fixtures ordered by defendant, 121 fixtures, were sold by plaintiff to various customers during the year 1962. (See Ex. 28, 29, 30, 31; 336–44) In each instance the fixtures had to be modified by plaintiff to meet the requirements of the purchaser. The cost of modification ranged from $31.48 (Ex. 31) to $39.96 (Ex. 28) for each fixture (381–84), this being in addition to the original cost of manufacturing. (415–16)

49. The plaintiff in good faith attempted to dispose of the fixtures manufactured for defendant by, among other things:

(a) Circulating a memorandum dated February 27, 1961 (Ex. C) to some 53 of the plaintiff's agents in the United States, offering to sell in units of 10 or more at prices ranging from $43.10 to $61.75 per fixture with incentives to its agents of a 20% commission on book price less 15%. (329, 335, 347, 350–53)

(b) Sending a second memorandum dated March 17, 1961 to the same agents offering to make further changes in the equipment. (330–33) This memorandum did not require any minimum order. (335)

(c) Sending a third memorandum correcting the prices on the first memorandum. (331–33) This memorandum likewise placed no minimum. (335)

(d) Sending a number of quotations for sale to possible purchasers without success. (344–53; Ex. 32, 33, 34)

(e) Offering the housing of these fixtures for sale without the ballasts and louvers. (355–56, 416–17)

It is noteworthy that the defendant's own "witness," Dilly, a dealer, admitted that he had received the bulletins with respect to the sale of the fixtures and had tried to sell them without success. (825) Consequently, plaintiff had a balance of 721 fixtures. What further efforts to mitigate damages defendant may reasonably expect do not appear.

50. In connection with the attempts of plaintiff to sell the fixtures, I find (a) that plaintiff acted with reasonable promptitude under all the facts and circumstances after defendant repudiated the contract and when defendant, after further notices, refused to pay for the goods; (b) that the methods of proposed sale and prices at which offered were reasonable under the facts and circumstances here and that it appears that no other offers of any kind to buy the rejected fixtures were made at any price; (c) that adequate notice to defendant was given with respect to the fixtures being available and that plaintiff's storage of the fixtures forfeited none of its rights to recovery.

51. I find that the damages claimed by the plaintiff amount to $20,265.62, made up as follows, and I find that the plaintiff is entitled to such damages with interest thereon from March 7, 1960:

| | | | |
|---|---|---|---|
| Purchase Price of 842 fixtures | | | $35,785.00 |

Less:

| | | | |
|---|---|---|---|
| Cost of Universal ballasts that were removed from the fixtures and then sold to other purchasers (3 ballasts per fixture × $3.30 × 842) | | $8,335.80 | |
| Cost of plastic louvers (2 louvers per fixture × $3.29 × 842) | | 5,540.36 | |

Sales of 121 fixtures in 1961–1962:

| | | | | |
|---|---|---|---|---|
| (1) Sale of 25 fixtures to Republic Electric (Ex. 28): | | | | |
| Invoice price | $1,860.00 | | | |
| Less: Cost of modification (25 × $39.96 per fixture) | | 999.00 | | |
| Commission 5% | | 93.00 | 768.00 | |
| (2) Sale of 12 fixtures to Requa Electric (Ex. 29): | | | | |
| Invoice Price | $ 606.00 | | | |
| Less: Cost of modification (12 × $35.04 per fixture) | | 420.48 | 185.52 | |
| Commission | | — | | |
| (3) Sale of 14 fixtures to Requa Electric (Ex. 30): | | | | |
| Invoice Price | $ 787.92 | | | |
| Less: Cost of modification (14 × $35.04 per fixture) | | 490.56 | | |
| Commission 10% | | 78.79 | $ 218.57 | |
| (4) Sale of 70 fixtures to Graybar Electric (Ex. 31): | | | | |
| Invoice Price | $4,760.00 | | | |
| Less: Cost of modification (70 × $31.48 per fixture) | | 2,203.60 | | |
| Commission 12½% | | 595.00 | $1,962.00 | $17,010.25 |
| | | | | $18,774.75 |

Add:

| | | |
|---|---|---|
| Storage charges for the fixtures during the months of February through June 1960 | | 688.45 |
| Moving charges re: transfer from Norwalk, Conn. to Hanson, Mass. | | 802.42 |
| | | $20,265.62 |

(Ex. 39)

## CONCLUSIONS OF LAW

1. This court by reason of the diversity of citizenship of the parties and the amount in controversy has jurisdiction of the subject matter and the parties to this action.

■ 2. Since the offer was accepted in Connecticut, the rights and liabilities of the parties are ordinarily determined under the law of Connecticut since it was in that state where the last act necessary for the formulation of the contract was performed (i. e., the mailing of the plaintiff's acceptance). Swift and Company v. Bankers Trust Co., 280 N.Y. 135, 141, 19 N.E.2d 992 (1939); Fremay Inc. v. Modern Plastic Machinery Corp., 15 App.Div.2d 235, 222 N.Y.S.2d 694 (1961); Perrin v. Pearlstein, 314 F.2d 863, 867 (2 Cir. 1963); Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R. 2d 246 (1954), espousing the so-called "grouping of contracts" or "center of gravity" or "most significant contacts" theory does not alter the result since New York would be inclined, under all the circumstances of this case, to choose the law of Connecticut. See Perrin v. Pearlstein, supra.

The significant contacts among others that occurred outside the State of New York are as follows:

The contract price and catalogue description as reflected in the purchase order were obtained during a telephone conversation between the defendant's office in Union City, New Jersey and the plaintiff's place of business in Norwalk, Connecticut; the plaintiff's original acknowledgment was prepared in Norwalk and mailed to the defendant in Union City, New Jersey; the defendant's letter in response to the plaintiff's original acknowledgment was written in New Jersey and mailed to the plaintiff's representative in Newark, New Jersey, who, in turn, forwarded it to Norwalk; the plaintiff's second acknowledgment was mailed in Norwalk and sent to the defendant in Union City. The plaintiff arranged for the purchase of the Universal ballasts (requested by defendant) and the plastic

louvers with suppliers who were located in New Jersey and Illinois respectively; the fixtures were actually fabricated in the plaintiff's factory in Norwalk. When these contacts are weighed against the contacts that occurred in New York—the preparation of the purchase order, the reduction of the number of fixtures and the arrangements for delivery—it cannot be said that most of the significant contacts were in New York. In any event, whether this court applies the law of New York or that of Connecticut to determine the validity or enforceability of the alleged agreement, the result is the same under both New York law and Connecticut law.

■ 3. The defendant contends that the plaintiff is barred from maintaining this action by reason of Section 218, New York General Corporation Law, McKinney's Consol.Laws, c. 23. However, this contention is without merit since the contract was not made in New York (Fremay Inc. v. Modern Plastic Machinery Corp., 15 A.D.2d 235, 222 N.Y.S.2d 694 (1961)) and the plaintiff was not "doing business" in New York. Max Factor & Co. v. Janel Sales Corp., 298 F.2d 511 (2d Cir. 1962); Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 115 N.E. 915 (1917). The fact that the contract was modified at a meeting in New York does not alter this result. International Fuel and Iron Corp. v. Donner Steel Co. Inc., 242 N.Y. 224, 151 N.E. 214 (1926).

### THE STATUTE OF FRAUDS

4. The defendant raises the affirmative defense of the statute of frauds. The New York and Connecticut statutes of frauds are similar. Compare Personal Property Law, McKinney's Consol. Laws, c. 41, § 85 and Connecticut General Statutes Annotated, § 52–551.

■ The writings upon which the contract was based, together with the references therein, constitutes sufficient memoranda signed by defendant or its agent to comply with the requirements of both the Connecticut (C.G.S.A. § 52–551) and the New York Statutes of Frauds (Personal Property Law, § 85). These writ-

ings include Exhibit 1, the invoice; Exhibit 2, the purchase order signed by defendant's President; Exhibit 3, the acknowledgment by plaintiff; Exhibit 3A, the letter from defendant signed by Lucy M. Jehring; and Exhibit 4, the revised acknowledgment. It is substantiated by Exhibit 9, the letter to plaintiff signed by defendant's agent, Roy Swensen, and the letter of cancellation (Ex. 11), dated March 7, 1960, signed by defendant's President.

■ It is well settled that no particular form of language or instrument is necessary to constitute a sufficient note or memorandum under the statute. *Conn.*: Burns v. Garey, 101 Conn. 323, 125 A. 467 (1924); J. E. Smith & Co. v. Say, 102 Conn. 558, 129 A. 538 (1925). *New York*: Mesibov Glinert & Levy Inc. v. Cohen Bros. Mfg. Co., 245 N.Y. 305, 157 N.E. 148 (1927). See also 37 C.J.S. Frauds, Statute of § 175, p. 653. Also, the note or memorandum required by the statute need not be contained in a single document; it may consist of a number of writings sufficiently connected so as to warrant their being read together; and which when so read satisfy all the requirements of the statute, as to contents and signature. *Conn.*: Landry v. Troeger, 15 Conn.Supp. 57 (1947); Falletti v. Carrono, 92 Conn. 636, 103 A. 753 (1918); Loomis v. Norman Printers Supply Co., 81 Conn. 343 71 A. 358 (1908); Burns v. Garey, supra; Kulmacz v. Milas, 108 Conn. 538, 144 A. 32 (1928). *New York*: Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 110 N.E.2d 551 (1953); Marks v. Cowdin, 226 N.Y. 138, 123 N.E. 139 (1919); Spiegel v. Lowenstein, 162 App.Div. 443, 147 N.Y.S. 655 (1914); Apollo Steel Company v. C. H. Brushaber & Co., Inc., 210 App.Div. 402, 206 N.Y.S. 301 (1924). It is also well settled that the memorandum required by the statute of frauds is not ineffective because it does not include a delivery date. Berman Stores Co. v. Hirsh, 240 N.Y. 209, 148 N.E. 212 (1925); N. E. D. Holding Co. v. McKinley, 246 N.Y. 40, 157 N.E. 923 (1927).

■ The defendant's letter seeking a delay in delivery (Ex. 9) and letter seeking cancellation (Ex. 11) are sufficient memoranda in writing recognizing the existence of the contract, as modified, to satisfy the statute. Rabe v. Danaher, 56 F.2d 758, 759 (2d Cir. 1932); DeNunzio v. DeNunzio, 90 Conn. 342, 97 A. 323 (1916); Atlas Shoe Co. v. Lewis, 202 App.Div. 244, 195 N.Y.S. 618 (1922); Spiegel v. Lowenstein, supra.

■ 5. In any event, the contract was not within the Connecticut or New York statute since the goods were to be manufactured (or fabricated) especially for the buyer and were not saleable to others in the ordinary course of business. Allen v. Jarvis, 20 Conn. 37 (1849); Frederick Raff Co. v. Murphy, 110 Conn. 234, 147 A. 709 (1929); Greenhill v. La-Licata, 205 Misc. 673, 130 N.Y.S.2d 231 (App.T.1954).

■ 6. The provision in the purchase order (Ex. 2) stating: "Subject to Final Approval by Owners," is not a condition precedent that prevented a consummation of the contract. The facts and circumstances here show approval by the owner through Sodora and Swensen. The defendant clearly led plaintiff to believe that the fixtures had been approved. It is thus estopped from denying it now. Van Iderstine Co. Inc. v. Barnet Leather Co. Inc., 242 N.Y. 425, 432, 152 N.E. 250, 46 A.L.R. 858 (1926).

"* * * The intent of the parties must be ascertained from a fair and reasonable construction of the language of the contract in the light of the surrounding facts and circumstances. Conditions precedent are not favored and the courts will not construe stipulations as conditions unless required to do so by plain, unambiguous language." United States v. Schaeffer, 319 F.2d 907, 911 (9th Cir. 1963).

### DAMAGES

■ 7. There is no doubt that a contract existed and that it was breached by the defendant. It is equally clear

that by December 23, 1959 plaintiff had fabricated the fixtures to a point that they were nearly ready for delivery. The fact that the louvers were not ready is not important since the plaintiff cancelled their order after the defendant requested a cancellation of its order. Certainly the defendant, which broke the contract, cannot complain of this feature since plaintiff was under no further obligation to perform, Lace Selling Company v. Shapiro, 249 N.Y. 68, 162 N.E. 586 (1928); Sagamore Corp. v. Willcutt, 120 Conn. 315, 180 A. 464 (1935), and the plaintiff may properly treat the repudiation as a breach and sue without further tender or performance provided he is otherwise ready and willing to perform.

■ The plaintiff's measure of damage is the same under both New York and Connecticut law since both states adopted Section 64 of the Uniform Sales Act. (Personal Property Law, § 145; C.G.S.A. § 42–64)[4] This statute in force at the time of the breach was as follows:

*"Action for damages for nonacceptance of the goods.*

"* * * 2. The measure of damages is the estimated loss directly and naturally resulting, in the ordinary course of events, from the buyer's breach of contract.

"* * *

"4. If, while labor or expense of material amount are necessary on the part of the seller to enable him to fulfill his obligations under the contract to sell or the sale, the buyer repudiates the contract or the sale, or notifies the seller to proceed no further therewith, the buyer shall be liable to the seller for no greater damages than the seller would have suffered if he did nothing

towards carrying out the contract or the sale after receiving notice of the buyer's repudiation or countermand. The profit the seller would have made if the contract or the sale had been fully performed shall be considered in estimating such damages."

The defendant's contention that in the event a breach of contract is found the damages in the absence of proof of value is the difference between the cost of manufacture and the contract or four cents per fixture, is patently absurd. This quaint attempt to diminish damages to approximately zero obviously disregards the character of the goods manufactured for defendant's requirements.

■ The net result is that the plaintiff is entitled to a judgment of $20,265.62, which amount equals the original purchase price for 842 fixtures, $35,785.00, plus storage and moving charges and less credits as set forth in Finding 51. Lieberman v. Templar Motor Co., 236 N.Y. 139, 140 N.E. 222, 29 A.L.R. 1089 (1923); Allen v. Jarvis, 20 Conn. 37 (1849); Belisle v. Berkshire Ice Co., 98 Conn. 689, 120 A. 599, 34 A.L.R. 108 (1923); 3 Williston, Sales (Revised Edition) § 583.

■ Under Connecticut law the plaintiff is entitled to interest at 6% per year from the date of the defendant's breach of contract, March 7, 1960. C.G.S.A. § 37–3; Sabo v. Strolis, 148 Conn. 504, 172 A.2d 609 (1961). Under New York law the plaintiff would likewise be entitled to the same interest. N.Y.Civ.Prac.Act 480, N.Y.Civ.Prac.Law & Rules § 5001; Flamm v. Noble, 296 N.Y. 262, 72 N.E.2d 886, 171 A.L.R. 812 (1947).

Settle judgment on notice pursuant to the foregoing.

4. The Connecticut statute was repealed in 1959. See 1959 P.A. 133, § 10–102, effective October 1, 1961. See Uniform Commercial Code, §§ 42a–2–704, 42a–2–708, 42a–2–710. However, since the contract was made in 1959 before the effective date of the Uniform Commercial Code in Connecticut, the Uniform Sales Act is applicable to this contract.