**ESQUIRE RADIO & ELECTRONICS, INC., Plaintiff-Appellee,**

v.

**MONTGOMERY WARD & CO., INC., Defendant-Appellant.**

**No. 1245, Docket 86–7114.**

United States Court of Appeals, Second Circuit.

Argued June 26, 1986.

Decided Nov. 5, 1986.

Patricia Hatry, New York City (Michael C. Lasky, Jeffrey M. Platte, Davis & Gilbert, New York City, of counsel), for plaintiff-appellee.

Ronald S. Platt, New York City (Theodore Gilbert, Kenneth A. Finder, Peter B. Croly, New York City, of counsel), for defendant-appellant.

Before NEWMAN, CARDAMONE and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

In this diversity action, Montgomery Ward & Co., Inc. ("Ward") appeals from a judgment entered after a seven-day jury trial in the United States District Court for the Eastern District of New York, Jack B. Weinstein, *Chief Judge*, awarding plaintiff-appellee Esquire Radio & Electronics, Inc. ("Esquire") $4,230,507.70 plus interest as of January 3, 1984, the date of anticipatory repudiation of Ward's obligation to purchase certain electronic products and spare parts from Esquire.

The judgment, originally entered on January 23, 1986, and amended on February 20, 1986, was based on a jury award of $2,414,976.86 for finished products, $1,235,-840.95 for spare parts inventory, $269,-689.89 for accounts receivable, and $283,-000.00 for a program called "Tangent."

Ward argues that: (1) as to the spare parts and accounts receivable claims, plaintiff failed to establish an implied or oral contract, and the claimed oral agreement is barred by the Statute of Frauds; (2) as to the accounts receivable claim, the district court should not have permitted Esquire to amend its complaint to include this claim, and it was error for the district judge to amend the judgment for $269,689.89 to one for $296,686.89 by post-judgment order; also that (3) it was error for the district judge to compute interest on the judgment award as of January 3, 1984, the date on which Ward terminated its business relationship with Esquire.

Esquire responds that the spare parts and accounts receivable claims were properly submitted to the jury on either an implied or oral contract theory or a promissory estoppel theory; that the Statute of Frauds does not bar recovery; that the evidence regarding accounts receivable was sufficient; that the district court did not abuse its discretion in correcting a clerical error in the accounts receivable award; and that the date of repudiation was the appropriate date for accrual of pre-judgment interest.

We hold that the spare parts and accounts receivable claims were properly submitted to the jury on a promissory estoppel theory; that the evidence regarding accounts receivable was sufficient; that the amendment of the $269,689.89 award to $296,686.89 was within the district court's discretion; and that the appropriate date for accrual of pre-judgment interest under N.Y.Civ.Prac.Law § 5001 (McKinney 1963) is not the date of anticipatory repudiation but an intermediate date during the period in which the repudiated payments were due.

Judgment affirmed in part. Award of interest vacated and remanded.

## BACKGROUND

Esquire is a Delaware corporation located in Brooklyn, New York that develops private brand consumer electronics products for sale by others. Ward is a national retail corporation with its principal place of business in Illinois and sells consumer electronics products. Both parties agree that their contractual relations at issue herein are governed by New York law.

Esquire and Ward were involved in a long-standing business relationship from 1958 until 1984. Initially, Esquire manufactured radios for sale by Ward under Ward trademarks. At that time, Esquire also manufactured radios for other major corporations, such as Sony and Panasonic. In the early 1960s, Ward's consumer electronics business expanded rapidly. During this time, consumer electronic products were increasingly manufactured in the Far East. Accordingly, Esquire's function on behalf of Ward shifted from primary manufacturing to providing "expertise to interface with foreign suppliers" and other technical, engineering, design and importing assistance. Products as to which Esquire had input in designing and developing were identified with model numbers preceded by the prefix "GEN." A tripartite product buy-back arrangement was instituted among Ward, Esquire and foreign manufacturers. The arrangement required Esquire to import and store finished consumer electronic products and spare parts for

Ward's ultimate repurchase. Although certain import orders, purchase contracts, fee schedules and other incidents of the buy-back arrangement were reduced to writings in the normal course of business and introduced at trial, the terms of the actual buy-back arrangement itself were never reduced to a written document.

Testimony and documentary evidence adduced at trial showed, and the parties do not dispute herein, that under the buy-back arrangement, Ward, as retailer, would issue an import order to a foreign manufacturer and pay the F.O.B. costs thereof. The manufacturer would ship the ordered goods to Esquire, as per Ward's instructions on the import order. Esquire, nominally a middle-man vendor, would accept delivery of the goods and pay Ward the so-called "landed cost" of the shipment, which was the F.O.B. costs plus other importing-related expenses, including a 5% handling fee to a Ward trading company. If the goods shipped were finished products, then the initial import order would have been issued along with a contemporaneous purchase contract under which Ward committed to purchase the goods from Esquire. If the goods shipped were spare parts, then no such *contemporaneous* purchase contract would have been executed, although Ward and Esquire would enter into such a contract when Ward's retailing needs for such parts arose. In all other respects, the arrangement was the same for finished products as for spare parts. Upon delivery by Esquire to Ward of the finished products or spare parts, Ward would pay Esquire a set purchase price consisting of repayment of Esquire's "landed cost" on the goods plus a commission. The commission to Esquire from Ward varied from time to time. The last rate, set in 1978, was 4⅞% on video goods and 11% on audio goods.

Esquire's long-term success in this arrangement depended upon the success of the "GEN" electronic models that it helped to design and import. During their business relationship over a period of at least twenty years, Ward paid Esquire the agreed commission on every GEN product

imported. Esquire would not import products on its sole initiative; rather, it accepted delivery of GEN products only pursuant to Ward's import orders. Further, because of Esquire's role in Ward's strategic planning and product development, John Fisher, Ward's National Merchandise Manager, asked Esquire early in the 1960s to cease doing work for Ward competitors. Esquire complied, gradually phasing out its other customers. There was evidence that by the end of 1983, over 95% of Esquire's resources were devoted to servicing Ward's requirements.

Esquire's profitability in spare parts, as to which there were no contemporaneous purchase contracts, depended heavily on the purchase by Ward of Ward's import order shipments, as to which Esquire accepted delivery and paid the "landed cost" in advance of such purchase. Esquire therefore became concerned at certain critical points in the relationship when its spare parts inventories accumulated significantly, especially since many of the spare parts apparently were uniquely suited for Ward's private label finished products. In response to Esquire's expressed concerns in the 1960s, Fisher assured Esquire that Ward would purchase the parts, and that in the meantime Esquire should simply hold them on account.

Similarly, in the early 1970s, at a meeting at Esquire attended by principals from both companies responsible for the buy-back arrangement and the spare parts account in particular, Esquire Executive Vice President Lynn and Sales Vice President Maffei expressed concern over mounting spare parts inventories and related cash advances. Esquire suggested that the parts inventory be shipped to Ward's newly opened National Parts Center in Berkeley, Illinois. Ward inspected the inventory and decided that it was too large for purchase at that time. Ward's Senior Vice President, Dean Lewis, urged Esquire to continue servicing the Ward account pursuant to the buy-back arrangement as it had developed. Lewis specifically assured Esquire

not to "concern yourself about the size of the inventory. We will take the parts."

On other occasions, Ward similarly reassured Esquire that purchases of spare parts were forthcoming. Successive Ward national merchandise managers reviewed with Esquire the buy-back arrangement and approved it as an ongoing business function. In 1975, Ward's Parts Specialist, Harris Asher, complained that Esquire's inventories of video cassette recorder parts were not high enough. When Esquire's Sales Vice President, Maffei, responded that such parts were very costly, Asher replied, "I don't know what you are concerned about. We are going to buy them from you anyway. We are going to use them. You ought to carry more and not be so tight on the quantities."

At trial, these statements were not contradicted by Ward employees in charge of merchandising or parts. Nor was there testimony contradicting the evidence that spare parts were sold only to Ward or that Esquire had no viable outlet for spare parts other than Ward. Notwithstanding the longevity of the relationship and the above noted assurances that Ward would repurchase Esquire's inventories, Ward determined from an internal audit initiated in February 1983 that the buy-back arrangement was no longer in Ward's interest. On May 12, 1983, a Ward task force reviewed the audit and discussed "Life after Esquire." By July 29, 1983, Ward concluded that the relationship was no longer financially justifiable, and by mid-August, 1983, that it was necessary to "identify the best possible way to terminate the relationship while protecting Montgomery Ward as much as possible." In November 1983, Ward devised an "Esquire Time and Action Plan" to track daily balances to minimize the amount of goods and money in Esquire's hands at the time of termination in the event that Esquire did not cooperate in the termination. All of these discussions and plans were kept completely secret from Esquire, which continued operating as usual under the assumptions that it had made during the twenty-year plus period of the buy-back arrangement.

On January 3, 1984, Ward informed Esquire for the first time of the termination. Concurrently, Ward advised Esquire that all foreign manufacturers had been instructed to divert ordered merchandise to a Ward facility rather than to Esquire, notwithstanding the existence of forty-one fully executed written purchase agreements with Esquire as to this merchandise, which included twenty-seven different consumer electronic models developed for Ward with Esquire's assistance. As to existing spare parts inventories, Esquire's Vice Presidents, Maffei and Lynn, testified that Ward promised to purchase the inventories pursuant to the termination negotiations. Marvin Stern, Executive Vice President of Ward for Merchandising, testified that Ward had represented only that it "would look into the issue of spare parts."

Esquire commenced an action in New York State Supreme Court, Kings County, on March 1, 1984. On or about March 12, 1984, Ward removed the action to the United States District Court for the Eastern District of New York. After a seven-day trial, the jury returned a verdict and award for Esquire, which Chief Judge Weinstein amended as described above. This appeal followed.

## DISCUSSION

It is clear that the district court had diversity jurisdiction over the action and that the applicable law was that of New York. Confronting the issues on appeal, we must consider whether under the New York law of contracts the district judge properly submitted the claims as to spare parts and accounts receivable to the jury; whether the evidence as to accounts receivable was sufficient and the district court's amendment of the damage award was proper; and whether the district court properly calculated that pre-judgment interest on the award accrues as of the date on which Ward formally repudiated any obligations it may owe to Esquire. We consider these issues *seriatim* below.

1. *The Contract Claims.*

As to the accounts receivable and spare parts claims on the forty-one written and fully executed purchase contracts covering various shipments of finished products, these agreements undoubtedly each establish the requisite elements of a contract. We therefore move immediately to those spare parts claims for which there were no contemporaneous or subsequent written purchase agreements. Notwithstanding the absence of a written agreement, courts applying New York law recognize other enforceable obligations, including oral contracts, *see, e.g., R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir. 1984) (applying New York law), implied contracts, *see, e.g., Jemzura v. Jemzura,* 36 N.Y.2d 496, 503–04, 330 N.E.2d 414, 420, 369 N.Y.S.2d 400, 408 (1975), and promissory estoppel, *see, e.g., Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 264 (2d Cir.) (citing New York cases), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). In our view, the doctrine of promissory estoppel applies to the facts of this case.

The doctrine of promissory estoppel, as set forth in Section 90 of the Restatement of Contracts and as adopted in New York, has three principal requirements: "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." Restatement (Second) of Contracts § 90 (1981), *quoted in Reprosystem,* 727 F.2d at 264; *see also James King & Son, Inc. v. De Santis Construction No. 2 Corp.,* 97 Misc.2d 1063, 1066, 413 N.Y.S.2d 78, 81 (N.Y.Cty.1977).

▇▇ Here, all three elements are present. As noted above, there was evidence that, on several critical occasions, Ward clearly and unambiguously promised to repurchase accumulated spare parts inventories. The evidence showed that in the 1960's, Fisher, a Ward manager, assured Esquire that Ward would purchase the spare parts and that in the meantime Esquire should consider such inventories as being held on Ward's account. Similarly, at a meeting of executives and managers from both companies in the early 1970s, Esquire specifically expressed its concerns regarding the costs and risks of mounting inventories, and Ward, this time through Senior Vice President Dean Lewis, explicitly advised Esquire not to "concern yourself about the size of the inventory. We will buy the parts." In fact, in 1975, Ward's Parts Specialist, Harris Asher, *unilaterally* approached Esquire's Sales Vice President, Maffei, to induce Esquire to increase spare parts inventories regarding certain cassette recorders. When Maffei responded that he was concerned about the potential costs of such accumulations, Asher replied, "I don't know what you are concerned about. We are going to buy them from you anyway. We are going to use them." Certainly these specific, clear and unambiguous statements at the very least "suffice[d] to create a factual question," *Dominguez v. Manhattan and Bronx Surface Transit Operating Authority,* 46 N.Y.2d 528, 532, 388 N.E.2d 1221, 1223, 415 N.Y.S.2d 634, 636 (1979), as to whether Ward had promised to repurchase accumulated spare parts during the tenure of the buy-back arrangement. Thus the question of whether there was such a promise was properly submitted to the jury.

▇▇ We draw the same conclusion as to whether Esquire reasonably and foreseeably relied on Ward's repurchase promises. At the meeting during the early 1970s, Ward's Senior Vice President, Lewis, not only promised that Ward would purchase Esquire's inventories; he also urged Esquire to continue accumulating inventories as it had been doing throughout the period of the buy-back arrangement. While it is true that at that meeting Ward declined to adopt Esquire's proposal that accumulated inventories be stored in Ward's newly opened National Parts Center in Berkeley, Illinois, we think it significant that Ward's stated reason for declining was not that it wished Esquire to bear the risks that spare parts might not be needed, but that the

Berkeley facility could not accommodate the size of the accumulated inventory. Further, in 1975, Asher, Ward's Parts Specialist, not only promised that Ward would buy Esquire's inventories but specifically sought to induce Esquire to accumulate more inventories in reliance on that promise: "You ought to carry more and not be so tight on the quantities." Certainly, based on this evidence the jury rationally could conclude that, over the years, Ward induced Esquire to accumulate spare parts by making several specific promises to repurchase such parts, and that Esquire reasonably and foreseeably relied on such promises.

Indeed, the structure of the buy-back arrangement provides further support for the view that Esquire, by its conduct, reasonably and foreseeably relied on Ward's promises to repurchase spare parts. Esquire purchased the parts solely according to Ward's particular and self-serving import orders. Had Esquire believed—contrary to Ward's assurances—that it bore the risk that whatever parts it had in inventory might not be repurchased by Ward, it is unlikely that it would have allowed such inventory to accumulate in reliance upon Ward's *carte blanche* import orders. Second, and more important, Esquire complied with Ward's request that Esquire assist in designing and developing products solely for Ward's benefit and that Esquire refrain from doing business with Ward's competitors. The relatively low mark-up that Esquire formulaically received on spare parts and Esquire's acquiescence in accumulating inventory to satisfy Ward's import orders and refraining from selling to Ward's competitors suggest that Esquire was reasonably relying on Ward's promises to repurchase spare parts. *Cf. Aron v. Gillman,* 309 N.Y. 157, 163, 128 N.E.2d 284, 288 (1955) (conduct of parties in business presumed reasonable in light of all surrounding circumstances). In short, the totality of the evidence permitted a rational trier of fact to conclude that, while Esquire assumed certain business risks that Ward would repurchase spare parts soon after Esquire accepted and paid "landed costs"

for them, Esquire reasonably relied on Ward's promises that Ward would *ultimately* repurchase the parts. This view is further supported by the evidence that many of the spare parts at issue herein were unique to Ward's private label finished products, and hence were not likely to be marketable to anyone other than Ward should Ward repudiate its obligation to repurchase the parts as it did here. *Cf. Franklin Research & Development Corp. v. Swift Electrical Supply Co.,* 236 F.Supp. 992, 1003 (S.D.N.Y.) (noting uniqueness of goods in construing existence of oral contract), *aff'd,* 340 F.2d 439 (2d Cir.1964); *Gura v. Herman,* 227 A.D. 452, 455–56, 238 N.Y.S. 230, 234–35 (2d Dep't 1929), *aff'd,* 253 N.Y. 618, 171 N.E. 808 (1930) (same).

Finally, we think it is clear that Esquire sustained injury by reason of its reliance on Ward's promises. Esquire continued to accumulate extensive spare parts inventories after repeated assurances by Ward that it would repurchase the inventory, which by the time of termination, exceeded $1.2 million paid by Esquire to Ward for the parts plus shipment costs, including the 5% fee charged by the Ward trading company. The bulk of spare parts inventory valuation evidence came from Esquire documents prepared in the ordinary course of business, and admitted in accordance with applicable rules of evidence. Based on this evidence, the jury awarded Esquire what it paid for the spare parts ($1,241,340.95), excluding any benefit of the bargain profit that Esquire would have realized had Ward not repudiated.

Ward seeks to avoid liability by arguing that any obligation it had to purchase spare parts is unenforceable under the Statute of Frauds. However, having reneged on its promise to repurchase Esquire's spare parts inventories, upon which Esquire reasonably relied, Ward is equitably estopped from raising the Statute of Frauds. *See Swerdloff v. Mobil Oil Corp.,* 74 A.D.2d 258, 263, 427 N.Y.S.2d 266, 268–69 (2d Dep't 1980); *United States v. Con-*

*solidated Edison Co.,* 452 F.Supp. 638, 653 (S.D.N.Y.1977), *aff'd on other grounds,* 580 F.2d 1122 (2d Cir.1978); Restatement (Second) of Contracts § 217A (1981). Further, under Uniform Commercial Code Section 2–201, N.Y.U.C.C. § 2–201 (McKinney Supp.1984–85), the Statute of Frauds would not apply here, since Ward's obligation was fundamentally not for the purchase of goods but for payment for Esquire's services in accepting delivery of, reimbursing "landed costs" for, and storing the spare parts. The buy-back arrangement functionally cast Esquire—although nominally a "vendor"—as a service affiliate of Ward for purposes of inventory control and expense deferment. To say that the arrangement was for the sale of goods is to ignore the terms and economic consequences of the arrangement. *See North American Leisure Corp. v. A & B Duplicators, Ltd.,* 468 F.2d 695, 697 (2d Cir.1972) ("When service predominates, the incidental sale of items of personal property, does not alter the basic transaction."). Finally, even construing, *arguendo,* the obligation as one for the purchase of goods, we note that the spare parts at issue herein, accepted for the benefit of Ward's ongoing retailing of private label electronic products and in the context of Esquire's compliance with Ward's request that Esquire not do business with Ward competitors, also might be considered "unique" goods and thus not subject to the Statute of Frauds. *See Franklin,* 236 F.Supp. at 1003; N.Y.U.C.C. § 2–201(3)(a) (McKinney Supp.1984–85); *see also* R. Duesenberg & L. King, *Sales and Bulk Transfers Under U.C.C.* § 2.02[4] at 2–36 (1985) (protections under the Code for "unique" goods not limited to manufacturers).

Having affirmed the judgment as to spare parts shipments lacking written purchase agreements on the theory of promissory estoppel, we need not reach the question of whether the judgment might equally be affirmed on the basis of implied or oral contract.

### 2. *Accounts Receivable.*

■ Ward raises two issues as to the accounts receivable claim. First, Ward argues that the district court abused its discretion in allowing Esquire to amend its complaint at the close of the introduction of evidence at trial specifically to claim $296,-686.89 in damages due to unpaid accounts receivable. We disagree. The evidence adduced as to accounts receivable included Esquire's accounts receivable ledger, prepared in the ordinary course of business, and the supporting documentation as to each open item, each of which had been sent to Ward and not rejected by Ward. In addition, Esquire's Vice President of Sales, Maffei, testified as to the three categories of damages herein—finished products, spare parts, and merchandise losses. As to accounts receivable, Maffei specifically reiterated the claim, documented in the ledgers, for $296,686.89. Under these circumstances, the district court did not err in allowing Esquire to conform its pleadings to the proof by specifically seeking damages for repudiation of accounts receivable. *See* Fed.R.Civ.P. 15(b); *see also Doralee Estates, Inc. v. Cities Service Oil Co.,* 569 F.2d 716, 724 (2d Cir.1977) (permitting amendment to add damage claim although complaint sought rescission). Nor may Ward successfully claim unfair surprise given that Esquire had effectively apprised it of the accounts receivable claim well in advance of trial on several occasions, including in its affidavits dated March 27, 1985, opposing Ward's motion for summary judgment; evidence offered at a hearing on May 30, 1985 on that motion; in correspondence between counsel and the court in July 1985; and during pre-trial discovery. A party cannot claim unfair surprise when it has been provided with notice of the subject of the amendment to a complaint, by discovery or documents, well in advance of the actual amendment. *See Securities and Exchange Commission v. Rapp,* 304 F.2d 786, 790 (2d Cir.1962).

■ Ward also challenges the propriety of the amendment of the jury award of $269,689.89 to $296,686.89 in a post-judgment supplemental order dated February 20, 1986. We do not think that the district court abused its discretion in making this amendment. The documentary evidence and testimony on damages clearly and un-

ambiguously referred to $296,686.89. That the jury returned an award of $269,689.89 on its special interrogatory form merely reflected the district court's clerical error of transposing the second and third digits in supplying therein the figure "$269,-689.89", which error counsel from neither side apparently noticed. It is a court's responsibility to correct a judgment that is based upon a clerical error. *American Trucking Associations Inc. v. Frisco Transportation Co.*, 358 U.S. 133, 145, 79 S.Ct. 170, 177, 3 L.Ed.2d 172 (1958). Under the circumstances noted herein, the error on the special interrogatory form was clearly a clerical error, and the district court's amended judgment in recognition thereof did not constitute an abuse of discretion under Fed.R.Civ.P. 60(a) and 60(b)(1).

### 3. *Accrual of Pre-Judgment Interest.*

■ Having affirmed the judgment of the district court as to liability and primary damages awarded, we turn now to the question of the appropriate date on which pre-judgment interest on the award accrues on the claims made under the written purchase contracts, as to which the district court awarded pre-judgment interest. The payments on these claims apparently would have been due at various times during 1984. The district court awarded pre-judgment interest as of January 3, 1984, the date on which Ward announced to Esquire the termination of the business relationship and the anticipatory repudiation of any payments that Esquire might have expected for prior shipments. Under New York law, pre-judgment interest should begin to run "from the earliest ascertainable date the cause of action existed." N.Y.Civ. Prac.Law § 5001(b). In the case of anticipatory repudiation on payments due over a period of time, this language has been construed to mean a reasonable intermediate date during the period in which payments due would have been made. *See, e.g., Decor by Nikkei International, Inc. v. Federal Republic of Nigeria and Central Bank of Nigeria*, 497 F.Supp. 893, 912 (S.D.N.Y. 1980), *aff'd*, 647 F.2d 300 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012,

71 L.Ed.2d 301 (1982); *Zimmer v. Wells Management Corp.*, 366 F.Supp. 215, 216 (S.D.N.Y.1973). To calculate interest due as of the date of anticipatory repudiation affords the plaintiff a windfall, and hence penalizes the defendant, in contravention of the *compensatory* purpose of section 5001. *See Morse v. Swank, Inc.*, 520 F.Supp. 829, 830 (S.D.N.Y.1981), *aff'd*, 688 F.2d 816 (2d Cir.), *cert. denied*, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982). Thus, we vacate the award of pre-judgment interest as of January 3, 1984, and we remand to the district court for amendment of that award in a manner not inconsistent with this opinion.

### CONCLUSION

We have considered appellant's other arguments and we find them to be without merit. For the reasons stated above, the judgment of the district court is affirmed in all respects except as to pre-judgment interest, as to which we vacate and remand for further proceedings.